**In re WILLIAM A. SMITH CONSTRUCTION COMPANY, INC., Debtor.**

**Bankruptcy No. B87–2310.**

United States Bankruptcy Court,
N.D. Ohio, E.D.

Aug. 24, 1987.

David Eisler, Cleveland, Ohio, for debtor, debtor-in-possession.

Edward R. Brown, Diana M. Thimmig, Cleveland, Ohio, for Halliburton Co.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

This matter came on for an evidentiary hearing upon the motion of Halliburton Company (Halliburton) for appointment of an interim trustee pursuant to § 1104 of the Bankruptcy Code [11 U.S.C. § 1104]. Due notice of the hearing was made upon all parties entitled thereto. In accordance with Rule 7052 of the Bankruptcy Rules, the following constitutes the findings and conclusions of the Court:

### I.

This is a core proceeding under relevant provisions of 28 U.S.C. § 157(b)(2)(A), wherein Halliburton, a secured Creditor, seeks the appointment of an interim trustee to administer the estate of William A. Smith Construction Company (Debtor). The Debtor, engaged in the railroad construction business, was owned by Halliburton from 1968 through April, 1986. In April of 1986, Halliburton sold the Debtor to a group of investors, headed by Charles A. Smith, subject to a retained secured interest. The sale was secured by a promissory note in the amount of $3,422,000.00, and is further evidenced by an agreement for sale and purchase of stock (Exs. 7 and 8). Subsequently, in October of 1986, Charles A. Smith resigned as the president of Debtor. Soon thereafter, Debtor entered into a consulting agreement with U.S. Trade Center (USTC) on November 20, 1986, for consultant services at an hourly rate of $220.00 per hour with a monthly cap of $75,000.00 and weekly overhead expenses not to exceed $2,500.00 per week (Ex. K).

Following the resignation of Charles A. Smith as corporate president, James Ray, another member of the investor group, became the Debtor's president on October 31, 1986. He remained in that capacity until July 1, 1987, when he tendered his resignation. On the same date, the Debtor sought relief under Chapter 11.[1]

### II.

*Applicable Law:*

The authority for appointment of a trustee is provided under § 1104 of the Code [11 U.S.C. § 1104]. Therein, it is noted:

---

1. The facts are disputed regarding the present ownership of the Debtor. Halliburton contends it became the sole shareholder of the Debtor as of June 26, 1987, whereas USTC contends it owns all of the Debtor's stock since February 2, 1987. (*See,* Debtor's Brief In Opposition, pp. 7, 11 and 24; and Ex. C.)

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor. [11 U.S.C. 1104(a)(1) and (2) ].

 In view of the above authority, it is further recognized that the appointment of a trustee is an extraordinary remedy (*In re Tyler*, 18 B.R. 574, 577 (Bankr.S.D.Fla. 1982), which should not be made lightly. *Official Creditors' Committee v. The Liberal Market, Inc.*, 13 B.R. 748, 752 (Bankr. S.D.Ohio 1981). Consequently, the party seeking the appointment bears the burden of proof, which must be sustained by clear and convincing evidence. *In re Crescent Beach Inn, Inc.*, 22 B.R. 155, 159 (Bankr.D. Me.1982); *Tyler, supra*, at 577.

 This appointive power of the court is to be exercised only where the protection afforded by a trustee is needed and the costs and expenses of a trustee would not be disproportionately higher than the value of the protection afforded. This test is not suggestive of a strict cost/benefit analysis, but rather, requires the Court to be mindful of any additional costs or expenses to the estate which could result from the appointment of a trustee. (H.Rept. No. 95–595 to accompany H.R. 8200, 95th Cong. 1st Sess. (1977) pp. 402, 403, U.S.Code Cong. & Admin.News 1978, p. 5787). Further, in the case of a nonpublic company, the appointment of a trustee

is discretionary if the interests of the estate and its security holders would be served thereby. In that instance, a cost/benefit analysis is not necessarily practical. (S.Rept. No. 95–989 to accompany S. 2266, 95th Cong., 2d Sess. (1978) p. 115).

 . In weighing the propriety of appointing a trustee, the court is not required to conduct a full evidentiary hearing. *In re Casco Bay Lines, Inc.*, 17 B.R. 946 (1st Cir. B.A.P. 1982); however, a full evidentiary hearing was held in the instant matter. The "for cause" standard of § 1104(a)(1) is more circumscribed, whereas under § 1104(a)(2) the Court has wider discretion to use its broad equity powers. Section 1104(a)(1) recognizes that there often is some degree of mismanagement which results in a debtor seeking relief under Chapter 11. Therefore, the proper standard is one of gross mismanagement, as opposed to mere mismanagement.

### III.

*Discussion:*

In the matter at bar, Halliburton asserts that the Debtor, through its agents, engaged in fraudulent and dishonest conduct by wrongfully transferring $450,000.00 of receivables prepetition into an Ameritrust account purportedly for the benefit of insiders. Further, Halliburton contends that the same Ameritrust account has been depleted postpetition by $34,280.73 between July 1 and July 10, 1987, at a time when no cash collateral order had issued. The Debtor refutes such allegations by contending that any transfers made were proper and were within the ordinary course of business since USTC was the sole shareholder of the Debtor when the alleged transfers were made.

In reaching a determination of this matter, the prepetition history of the Debtor is relevant. Therein, it is noted that Charles A. Smith resigned as the Debtor's president on October 31, 1986. He was succeeded by James Ray who served as Debtor's president from October 31, 1986 through July 1, 1987. The Debtor's Chapter 11

petition was filed on July 1, 1987. Post-petition, the Debtor is without a president or chief executive officer at its helm. Further compounding this situation is the disputed ownership of the Debtor corporation as heretofore mentioned. (*See,* Debtor's Brief In Opposition, pp. 7, 11, 14, 19 and 24; Exs. A and B; and Ex. 5). Halliburton claims to be the Debtor's sole shareholder as of June 26, 1987, whereas USTC contends it has owned all of the Debtor's stock since February 2, 1987. Equivocally, however, USTC acknowledges that Halliburton possessed all of the Debtor's stock pursuant to a certain pledge agreement, in addition to having effective control of the Debtor. (Debtor's Brief In Opposition, p. 14).

▪ The role of USTC is particularly remarkable in this matter. The evidence clearly demonstrates that USTC is a most active participant both prepetition and postpetition in the Debtor's management. (Tr. 75, 237, 367–79, 385–86). Yet the evidence further reveals that USTC and its agents are consultants and not part of the ongoing and duly constituted management of the Debtor. (Tr. 7). A non-court appointed consultant at the helm of a debtor corporation postpetition does not comport with the letter nor spirit of managerial requirements set forth in §§ 1107 and 1108 of the Code. Generally, a debtor corporation without a duly constituted president and/or chief executive/operating officer is without effective managerial control and lacks the capability of preserving the estate's assets for the benefit of its creditors. In such instances, the appointment of a trustee is appropriate. Further, a consultant retained prepetition may only continue to serve in that capacity, postpetition, only upon request as is allowed by § 327 of the Code. No such request has been made postpetition.

▪ During the course of the Debtor's case-in-chief, much testimony was elicited regarding the benefits bestowed by USTC upon the Debtor by reason of USTC's consult. Substantiality of benefits conferred is not necessarily a required determinant for § 1104 considerations. Moreover, the services provided by USTC, for the most part, are undisputed.

### IV.

▪ Halliburton further contends that $450,000.00 of the Debtor's receivables were fraudulently and dishonestly diverted for the benefit of insiders. In support of that contention, Exhibit # 6 reveals that an Ameritrust money market account was opened on February 18, 1987 in the Debtor's name by an agent of USTC (Tr. 119). As part of that transaction, a corporate resolution was delivered to Ameritrust which, *inter alia,* indicated that the Debtor was duly organized and existing under applicable Ohio laws at the time the account was opened. (Ex. 6). Contrary to those representations, the Debtor's Brief, at p. 10, and testimony clearly indicate that Articles of incorporation were not filed in Ohio until July 15, 1987 (Tr. 406). Such conduct by the Debtor is further reflective of a debtor without effective managerial control.

Between March 20, 1987 and April 3, 1987, the following deposits were made to the Debtor's Ameritrust account:

| Deposits: | | | |
|---|---|---|---|
| 3–20–87 | — | $ 40,000.00 | wire transfer deposit |
| 3–26–87 | — | 133,483.83 | deposit |
| 4–3–87 | — | 204,250.00 | wire transfer deposit |
| | | $377,733.83 | |
| Withdrawals: | | | |
| 4–8–87 | — | $200,000.00 | to Cleveland-Youngstown Redevelopment |

From April 3, 1987 through May, 1987, no further deposits were made to the subject Ameritrust account. (Tr. 124). During this same period, however, withdrawals of approximately $350,000.00 were made. The record is silent regarding the disposition of these withdrawals from this account which was controlled by the Debtor's consultant USTC. (Tr. 126, 484). On the petition filing date, July 1, 1987, there was a $42,050.17 balance in this account; however, on July 10, 1987, the account balance had dwindled to $7,769.44, and the account was closed on July 31, 1987. (Tr. 125). The record is silent regarding the disposition of these postpetition account with-

drawals. What is known is the fact that no court authority was sought and obtained to effect any postpetition transfers of the Debtor's bank funds.

Among the several provisions and terms of the Agreement For Sale And Purchase Of Stock Of The Debtor (Ex. 8), there is contained therein certain affirmative and negative covenants. (Ex. 8, pp. 10–15). Among the affirmative covenants, the evidence adduced reveals that punctual payments of principal, interest and other charges is required, although the Debtor is delinquent in this regard (Ex. 8, p. 10; Tr. 271, 332, 398). Another affirmative covenant requires the deposit of all of the Debtor's monies to be made in specified accounts at Lockwood National Bank or other mutually agreed to depositories. Any checks drawn thereon are to be countersigned by a designee of Halliburton (Ex. 8, p. 12; Tr. 36). The testimony clearly revealed that these affirmative covenants have been breached. All of the affirmative covenants are to be complied with as long as the Debtor has an outstanding indebtedness to Halliburton (Ex. 8, p. 10 and Tr. 330–31). Specifically, the Debtor's financial position and results of operations for each fiscal year must be certified by the Debtor's president and chief financial officer. (Ex. 8, pp. 1, 12). Without a president, that covenant is breached. The transfer of the Debtor's aforesaid funds to an Ameritrust bank account in Cleveland, without Halliburton's consent, is a breach of an affirmative covenant. The subsequent withdrawals from the Ameritrust account without a countersignature by a Halliburton designee is a further breach of the subject sales agreement. Additionally, the postpetition payment of $13,420.00 to Gary Harris on July 10, 1987 was without authorization.

In addition to the affirmative covenants contained in Exhibit # 8, there were also several negative covenants. One such negative covenant forbade the Debtor from abandoning or otherwise disposing of any collateral or any part thereof (Ex. 8, p. 14). The credible testimony of Paul Dalida clearly indicates that this covenant has been breached. (Tr. 241–44). Another of the several negative covenants prohibited the Debtor from entering into any executive employment or management consulting agreement or changing any existing management consulting agreement without Halliburton's prior written consent as long as Debtor had an outstanding indebtedness to Halliburton. (Ex. 8, p. 15). Likewise, the evidence shows that this covenant has also been breached (Tr. 327–329). The resulting effect of the several breaches of covenants contained in Exhibit # 8 is to render impaired the secured interest of Halliburton.

In summary, the Debtor is without adequate managerial control and has depleted corporate assets both prepetition and postpetition without authorization. Because of these occurrences, the appointment of a trustee would be in the best interest of creditors.

## CONCLUSION

Accordingly, Halliburton has sustained its burden of proof by clear and convincing evidence. The motion to appoint an interim trustee is granted, and such appointment will be made forthwith under separate order of this Court.

IT IS SO ORDERED.