**In re SKY VALLEY, INC., Debtor.**

**Bankruptcy No. 88–20041 MHM.**

United States Bankruptcy Court,
N.D. Georgia,
Gainsville Division.

Jan. 8, 1992.

---

J. Michael Levengood, Atlanta, Ga., for debtor.

Elizabeth Stuhldreher, Office of U.S. Trustee, Atlanta, Ga., for U.S. Trustee.

Claude D. Mason, Duluth, Ga., for 1st Nat. Bank.

Susan Kramer, Parker, Johnson, Cook & Dunlevie, Atlanta, Ga., for Anchor Bank.

## ORDER

MARGARET H. MURPHY, Bankruptcy Judge.

This matter is before the court on the applications for compensation of Carolina Auction Team, Inc. ("CAT"); Bridge Properties ("Bridge"); and Debtor's attorney ("Debtor's attorney" refers to the law firm employed by Debtor; more than one attorney in the firm rendered legal services to Debtor). CAT requests compensation in the amount of $292,422.58, which equals 7% of the gross sales proceeds from the auction of Debtor's property. Bridge requests compensation in the amount of $125,323.96, which equals 3% of the gross proceeds from the auction of Debtor's property. Debtor's attorney seeks final compensation in the amount of $378,098.

Objections to the applications for compensation of CAT and Bridge were filed by Anchor Bank and comments opposing the applications of CAT and Bridge were filed by the U.S. Trustee. Hearings were held on all three applications and all parties were afforded the opportunity to present written briefs on the issues. For the reasons set forth below, CAT's application for compensation is approved in the amount of $287,422.58. The application of Bridge Properties for compensation is denied; Gary Anglin is directed to disgorge all amounts paid by CAT to or on behalf of Mr. Anglin or Bridge Properties as compensation to Bridge. The final application of Debtor's attorney is approved in the amount of $338,799.

## STATEMENT OF FACTS

Debtor's principal asset was a ski and golf resort community located in North Georgia.[1] Debtor's chairman of the board, sole shareholder and *quasi* chief executive officer is Dr. Miles Mason. Dr. Mason is also a practicing physician with his principal offices located in Norcross, Georgia. Debtor's chief operating officer is George William ("Bill") Mason, Dr. Mason's son. The other members of Debtor's board of directors include James Mason, another son of Dr. Mason, and Dr. Mason's wife.

In December 1987, Bill Mason and James Mason became aware that Debtor was in financial difficulty; specifically, they realized that Debtor's cash flow would soon be insufficient to make the required payments to its secured creditors. Bill and James Mason "thought of only one person that could possibly help us out and that was Gary Anglin." They contacted Mr. Anglin and recommended to Dr. Mason that Dr. Mason engage Mr. Anglin to advise Debtor concerning its current financial condition and the most appropriate course of action. When it was decided that Debtor should file a Chapter 11 bankruptcy petition, Mr. Anglin recommended attorneys for Dr. Mason to consult concerning representing Debtor in a Chapter 11 proceeding and Mr. Anglin attended the meetings at which firms were interviewed.

After the filing of the Chapter 11 bankruptcy petition, Mr. Anglin continued to play an active role in the management of

1. Debtor defaulted postconfirmation in 1991; Anchor Bank, a secured creditor, foreclosed upon a substantial portion of the property.

the Chapter 11 proceeding: Mr. Anglin negotiated with creditors; he consulted with and instructed Debtor's attorney; he met and negotiated with proposed professionals; he met and advised Dr. Mason concerning recommendations and decisions necessary for progress of the case, and then, upon Dr. Mason's decision on particular matters, Mr. Anglin coordinated and facilitated implementation of those decisions. At the hearings on the applications for compensation, Mr. Anglin's relationship to Debtor was consistently described as that of advisor and consultant but with no independent decision-making authority. Mr. Anglin maintained that all such authority resided with Dr. Mason or with the board of directors and that Mr. Anglin acted primarily as liaison with Dr. Mason. Mr. Anglin's services were described as necessary because Dr. Mason is a practicing physician working in his medical practice 12–14 hours per day; Dr. Mason's sons, Bill and James, were occupied with the day-to-day operation of Debtor. During the progress of Debtor's Chapter 11 case, Mr. Anglin filled the void created by Dr. Mason's unavailability and his sons' preoccupation with Debtor's day-to-day operations.

Before the Chapter 11 petition was filed, Dr. Mason and Mr. Anglin concluded Debtor lacked the cash flow to hire and compensate Mr. Anglin as an advisor/consultant. Therefore, it was decided between Dr. Mason and Mr. Anglin that Debtor would employ Bridge Properties, a business in which Mr. Anglin has an ownership interest, as real estate broker for Debtor's property and, thus, Mr. Anglin would be compensated for his services as advisor/consultant through commissions collected upon sales of Debtor's property. No evidence exists to show that Debtor's attorney was informed of this decision.

Not long after Debtor's Chapter 11 case was filed, Mr. Anglin instructed Debtor's attorney to prepare and file an application for employment of Bridge Properties. The recollections of Debtor's lead attorney and of Mr. Anglin differ concerning representations Mr. Anglin made or did not make concerning his connection with Bridge.

Debtor's lead attorney remembers that he asked Mr. Anglin if Mr. Anglin had any connection with Bridge, to which Mr. Anglin answered, "No." The lead counsel also remembers that he asked Mr. Anglin who owned Bridge but never received an answer. The same attorney stated that he assumed that the person identified as the broker for Bridge Properties was the owner.

On the other hand, Mr. Anglin remembers only that he told the lead debtor's attorney that Anglin could not sign the affidavit to accompany the application to approve employment because Anglin is not a licensed real estate sale agent or broker. The assumption that the broker was the owner of Bridge might logically follow from an assertion by Mr. Anglin that he was neither agent nor broker. The testimony of Mr. Anglin and the lead attorney, however, might also support a conclusion that Mr. Anglin was very careful not to actually lie to Debtor's attorney concerning his connection with Bridge but was also very careful not to disclose that connection. Debtor's attorney, on the other hand, cognizant of Mr. Anglin's unofficial position within Debtor's organization, was not sufficiently diligent in asking the questions which might have elicited the disclosures necessary to expose Mr. Anglin's connection with Bridge.

After determining that Debtor wished to employ Bridge as real estate broker, Debtor's lead attorney instructed a junior associate by memo to prepare an application for approval by the bankruptcy court to employ Bridge. The memo to the junior associate contained the telephone number with which he could contact Patricia Bunn if further information were necessary for completion of the application to employ. The application as finally completed sought approval of employment of Michael Norris d/b/a Bridge Properties. The affidavit accompanying the application was signed by Patricia Bunn, the licensed real estate agent for Bridge. The application did not mention Mr. Anglin or disclose any interest Mr. Anglin held in Bridge. An order was entered August 23, 1988, approving the

employment of Bridge and providing that no compensation be paid without court approval.

At the hearings held in 1990, almost a year after the auction sale of Debtor's property, which were held in connection with the applications for compensation, Mr. Anglin appeared before this court for the first time. It was disclosed that Mr. Anglin was in fact an owner of Bridge Properties and, as noted above, that Debtor and Mr. Anglin intended that the commissions payable to Bridge would serve as Mr. Anglin's compensation for the advisory and consulting services he provided to Debtor. Michael Norris, Patricia Bunn and Mr. Anglin testified concerning their individual relationships with Bridge Properties.

Michael Norris is a licensed real estate broker who is employed by Michael Norris, Inc., from which he earns more than 99% of his income. Mr. Norris testified that he serves as the broker for Bridge, but that he had collected only one commission from Bridge in the years since its formation, which commission equalled less than 1% of his income for that year. Mr. Norris characterized himself as a participant in Bridge Properties. He never made any capital contribution to Bridge; he was not a signator on any bank accounts of Bridge. Mr. Norris also testified that he had never seen the application for Debtor to employ Bridge; he was not aware that Bridge had been employed by Debtor; he was not involved in any sale of Debtor's property and collected no commission or other proceeds from any sale of Debtor's property.

Patricia Bunn testified that she had been associated with Mr. Anglin for several years before Bridge Properties was formed. Ms. Bunn, as well as Mr. Norris and Mr. Anglin, testified that Bridge was formed to allow Ms. Bunn to use her license and to market the properties owned by Mr. Anglin. Ms. Bunn described herself as an owner of Bridge. She acknowledged, however, that she made no capital contribu-

tion to Bridge, that no written agreement existed concerning ownership, split of commissions or profits of Bridge, and that she had collected only one commission through Bridge. She did, however, receive what would appear to be a salary in the approximate amount of $30,000 per year from Mr. Anglin for marketing Anglin's properties. Ms. Bunn testified that during the years she had worked for Bridge, only one parcel of property had been sold. That parcel was real property owned by Mr. Anglin which was sold to Arby's. Additionally, the listing of Debtor's property was the only property not owned by Mr. Anglin which Bridge had ever listed. She stated that she obtained no buyers or offers for any parcel of Debtor's property. She did not assist with or attend the auction or procure the sale of any of Debtor's property.

Ms. Bunn signed the affidavit which accompanied the Bridge employment application. The affidavit was mailed to her by a junior associate attorney for Debtor following a telephone conversation. Although Ms. Bunn knew of Mr. Anglin's connection with Bridge and of Mr. Anglin's role as advisor/consultant to Debtor, those connections were not disclosed in the application or the affidavit. Her testimony, however, establishes that the terms "disinterested" and "adverse interest" were not explained to her by Debtor's attorney. She was not asked questions concerning ownership of Bridge.

Finally, Mr. Anglin's description of his connection with Bridge was direct and candid: "See, Bridge Properties is me." Bridge owns no tangible assets; and at all times relevant to this proceeding, Bridge had no office except that provided to Mr. Anglin by Debtor. The telephone number shown for Bridge on signs at Sky Valley and on other advertisements placed by Bridge was a Sky Valley number. Except for $12,500 paid to Ed West[2] and $8,500

---

2. Ed West is a real estate broker, not employed by or associated with Bridge Properties, who had previously listed several privately-owned properties located at Debtor's resort. Mr. Anglin testified he hired Mr. West to "do some things" which were never clearly defined. Mr. West's employment was never disclosed, nor was Mr. Anglin's intent to share his commission with Mr. West disclosed. Mr. West was also a purchaser at the auction of Debtor's property.

paid to Patricia Bunn, all of the more than $100,000 paid by CAT to Bridge was disbursed to Mr. Anglin personally ($79,300) or to entities controlled by Mr. Anglin ($13,253).[3]

The contract between Debtor and Bridge Properties provided for an exclusive listing. The application for employment and the order entered pursuant to that application, however, provided for a non-exclusive listing. The discrepancy was not explained. Bridge sold none of Debtor's property pursuant to the listing contract.

Debtor's plan of reorganization was confirmed by order entered June 14, 1989. The plan provided that Mr. Anglin would lend Debtor $300,000; in return for such loan, Mr. Anglin would receive a security interest in Debtor's property, subordinate only to Bank South's second priority security interest. Mr. Anglin did, in fact, lend approximately $365,000 to Debtor post-confirmation. No promissory note or deed to secure debt or any other loan documents have been executed by Debtor in favor of Mr. Anglin in connection with the loan from Mr. Anglin.

Subsequent to confirmation,[4] Debtor filed an application to sell by auction certain real property of Debtor free and clear of liens and encumbrances. In connection with that application to sell, Debtor filed an application to employ Carolina Auction Team, Inc. as auctioneer. The CAT employment application provided that a 10% commission calculated on the gross proceeds from the auction would be paid, with 7% paid to CAT and 3% paid to Bridge. The CAT application to employ failed to disclose any connection between Bridge and Anglin. No amendment to Bridge's application to employ was filed in connection with the auction or at any other time.

When Dr. Mason made the decision to sell Debtor's property by auction, Bill Mason and Mr. Anglin began interviewing auction companies. All of the auction companies interviewed proposed to charge a commission of 10% of the gross sales proceeds. The decision to employ CAT was made by Bill Mason.

After the decision to employ CAT was made, representatives of CAT, Bill Mason, and Mr. Anglin met further to discuss the auction and CAT's employment. They determined that some land development must be undertaken to ready the property for sale; specifically, construction of roads was apparently necessary to provide access to the building lots which would be included in the auction. Mr. Anglin, based upon his offer to perform certain marketing and development services in connection with the auction, which would otherwise have been performed by CAT and surcharged against the proceeds, and also based upon the listing contract between Debtor and Bridge, was able to negotiate with CAT the 7%/3% split of the 10% commission on the auction proceeds.

Neither the application to employ CAT nor the application to sell disclosed the necessity for or provided for payment for construction of the roads or any other land development from the proceeds of the auction. Thus, the anticipated cost of such development was not reviewed by creditors or by the bankruptcy court. Additionally, payments for construction of roads and other land development were paid from the proceeds of the auction in the amount of approximately $40,000, without notice to creditors or to the U.S. Trustee and without court approval. The payment of such costs added to the unworkability of Debtor's negotiated formula for disbursement of proceeds to secured creditors following the auction. Without the negotiated formula for payment, the consent of secured creditors would likely not have been obtained. Appropriate public disclosure of

---

**3.** These entities, in addition to Bridge, are Agnew Properties, a sole proprietorship owned by Mr. Anglin, and Williamsburg, Ltd., of which Mr. Anglin is the general partner.

**4.** Pursuant to § 1141, after confirmation, permission from the bankruptcy court to sell property of the estate or for payment of compensa-

tion for professional services performed after confirmation is generally unnecessary. In the instant case, however, Debtor's plan specifically provided for retention by the bankruptcy court of jurisdiction to approve sales free and clear and to fix allowances of compensation.

the anticipated development costs would have armed creditors, the U.S. Trustee and the bankruptcy court with the knowledge which would have been essential to making an appropriate and timely objection and, therefore, necessary to enable intelligent choices and decisions.

Orders approving the application to employ CAT and the application to sell were entered August 2, 1989 and August 16, 1989, respectively.[5] Both orders provided that no payments would be made to professionals until after an accounting of the auction and appropriate applications for compensation were filed.

At the auction, the proceeds received in the form of down payments from purchasers, in the approximate amount of $520,000, were retained by CAT. The gross sales proceeds totalled $4,177,465.50. CAT, Mr. Anglin and Bill Mason testified that they had not read or had not absorbed the provisions in the order allowing the sale and the order for CAT's employment which required applications for compensation prior to payment of compensation. Bill Mason, however, testified he was aware that no payments should be made without court authorization. Yet, even though Bill Mason knew that CAT was making disbursements, he took no steps to prevent such payments. Following the auction, CAT disbursed funds in accordance with its contract with Debtor and without reference to the court orders. From the funds it held, without application to or authorization by the bankruptcy court, CAT disbursed payments for the road construction, disbursed funds to itself in payment of its commission and disbursed funds in payment of Bridge's commission. Debtor's attorney apparently failed to take possession of the proceeds or even request an accounting from CAT of the proceeds of the auction, which took place August 19, 1989. Debtor's attorney failed to adequately advise CAT or Mr. Anglin that no payments could be made from those proceeds without authorization by the bankruptcy court.[6] In fact, Debtor's attorney stated he was unaware that disbursements had been made by CAT until sometime during the summer of 1990.[7]

## CAT'S APPLICATION FOR COMPENSATION

■ A contingency fee or an auctioneer's commission are specifically allowable pursuant to 11 U.S.C. § 328(a). Section 328(a), however, also provides:

> ... Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

Thus, any order approving employment on a contingency fee basis or commission is not binding in a subsequent proceeding on compensation if the terms of employment

---

5. The motion to sell which was approved by order entered August 16, 1989, provided a formula for payment of the secured creditors which Debtor had negotiated with the creditors prior to filing the motion. After the sale, however, and partially as a result of the undisclosed and unauthorized payment of land development expenses, the formula proved unworkable. Further hearings ensued and briefs were filed in which the predominant dispute was whether the prior order, premised upon incomplete facts, should prevail over Bankruptcy Code priorities. As a result of the order entered January 17, 1991, creditors who expected to receive some payment from the proceeds of the sales of Debtor's property received nothing.

6. Debtor's attorney did advise Dr. Mason by letter shortly after the case commenced that no payments could be made to professionals without authorization by the bankruptcy court. Mr. Anglin was contemporaneously so advised by copy of that letter.

7. Debtor's attorney's fee application shows Debtor's attorney was contacted by the U.S. Trustee in April, 1990, concerning CAT's payment of auction expenses without court authorization. The first hearing on the applications of CAT and Bridge for compensation was held June 21, 1990, but was continued to August 10, 1990, with directions that an accounting should be filed by July 10, 1990. CAT's accounting was filed August 10, 1990; Bridge's accounting was filed September 18, 1990. Further hearings were held in November and December 1990.

prove to be inequitable or unreasonable. *In re Schwemmer Hardware Co., Inc.*, 103 B.R. 635 (Bankr.E.D.Pa.1989).

■ In the instant case, CAT seeks payment of a 7% commission in the amount of $292,422.58. CAT, however, disbursed funds in its custody without consulting with Debtor's attorney and without obtaining authorization from the bankruptcy court. CAT knew that an application to approve its employment had been required, yet CAT neglected to review the order approving that employment to ascertain the correct procedure for collecting its fee. It relied solely on its contract with Debtor. CAT's failure to recognize and fulfill its duties under the Bankruptcy Code renders payment of its full 7% commission unreasonable. The disbursement of its own and Bridge's compensation without court approval could support denial of payment to CAT of any compensation whatsoever. *See, Anderson v. Anderson*, 936 F.2d 199 (5th Cir.1991); *Grassmueck v. Zamsky (In re E Z Feed Cube Co., Inc.)*, 123 B.R. 69 (Bankr.D.Or.1991). CAT, however, was unfamiliar with bankruptcy proceedings, had never before performed an auction under bankruptcy court jurisdiction, and was not independently represented by counsel at the time. Under the circumstances, Debtor's attorney was insufficiently diligent in supervising the auction and disbursement of proceeds.

CAT's payment of approximately $40,000 for road construction was also unauthorized.[8] The bankruptcy system is premised to a large degree on the Fourteenth Amendment Due Process principles of notice. The type and extent of notice required is described in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950): "[N]otice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." The bankruptcy process itself provides a mechanism which by its nature abhors se-

crecy; similarly, bankruptcy abhors undisclosed payments and expenditures.

■ The administration of a bankruptcy case is not, *sui generis*, necessarily adversarial, as the processes, priorities and duties of the parties are clearly set forth in the Bankruptcy Code. The interests, however, of each creditor are affected by any action which affects the dividend payable to creditors. Accordingly, the obligations of a debtor, and professionals employed by the debtor, especially debtor's attorney, are necessarily fiduciary. Unless those fiduciary duties are fulfilled, the bankruptcy process appears to creditors and the public to be tainted by self-interest, abuse of the bankruptcy process, or even fraud. As a consequence, it is ultimately the duty of the bankruptcy court, with the assistance of the U.S. Trustee, to monitor the conduct of the debtor and the professionals he employs to assure fidelity not only to the express requirements of the Bankruptcy Code but also to the policies which underlie such requirements. The first exercise of duty, however, falls upon the debtor's attorney, who is the legal specialist as to compliance with debtor's duties.[9]

The unauthorized payment of the road construction expenses resulted in a shortfall in the amount available to pay the lien of the second priority secured creditor which, in turn, resulted in a lack of funds available to pay subordinate secured creditors. If the anticipated costs for road construction had been disclosed in a timely manner, before the funds were expended, creditors' objections could have been timely filed and determined. Instead, the payments came to light only after CAT filed, at the court's direction, an accounting. The requirement for court approval before payment of any compensation was included in the order approving CAT's employment, but CAT failed to read or assimilate the provisions of that order. The unauthorized payments of road construction were apparently made by CAT innocently. Additionally, the testimony at the hearing on CAT's application for compensation showed that

---

**8.** The actual amount appearing in CAT's accounting of the proceeds equals $37,864.74.

**9.** See discussion at pages 937–939.

the road construction was a necessary and reasonable expense attendant to the auction of Debtor's property. The full disclosure of anticipated road construction expenses at the time of Debtor's motion to sell may, however, have elicited objections which could have prevented approval of the sale. Nevertheless, CAT is not culpable for the decrease in the proceeds which was occasioned by the unauthorized payments. Accordingly, CAT is allowed compensation in the amount of $287,422.58.

## BRIDGE PROPERTIES' APPLICATION FOR COMPENSATION

■ The U.S. Trustee and Anchor Bank object to the payment of compensation to Bridge Properties and Gary Anglin on the grounds that at the time the employment of Bridge Properties was approved, Bridge was not disinterested because Gary Anglin is an insider of Debtor. It is argued that the failure to disclose Mr. Anglin's status as an insider of Debtor renders Bridge subject to disqualification and disgorgement of fees already paid.

In order to approve the employment of a professional by Debtor, it must be shown that the professional is disinterested within the meaning of 11 U.S.C. § 327(a) and 11 U.S.C. § 101(14). Section 101(14) defines "disinterested person" as a person who:

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not an investment banker for any outstanding security of the debtor;

(C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an investment banker in connection with offer, sale, or issuance of a security of the debtor;

(D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in sub-paragraph (B) or (C) of this paragraph; and

(E) does not have an interest materially adverse to the interests of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor ..., or for any other reason[.]

Therefore, if Mr. Anglin is an insider of Debtor, Bridge Properties would have been disqualified from employment by Debtor as a professional. Section 101(31) defines an "insider" as:

(B) if the debtor is a corporation—
(i) director of the debtor;
(ii) officer of the debtor;
(iii) person in control of the debtor;
...
(F) managing agent of the debtor[.]

The House and Senate Reports commenting on § 101(31) describe insiders:

**An insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.** If the debtor is an individual, then a relative of the debtor, a partnership in which the debtor is a general partner, a general partner of the debtor, and a corporation controlled by the debtor are all insiders. If the debtor is a corporation, then a controlling person, a relative of a controlling person, a partnership in which the debtor is a general partner, and a general partner of the debtor are all insiders. If the debtor is a municipality, then an elected official of the debtor is an insider. In addition, affiliates of the debtor and managing agents are insiders. (emphasis added)

H.R.Rep. No. 595, 95th Cong., 1st Sess. 312 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978) U.S.Code Cong. & Admin.News 1978 pp. 5787, 5810, 6267.

In the instant case, despite the emphatic statements that Mr. Anglin had no decision-making power with respect to Debtor, the description of Mr. Anglin's conduct as advisor/consultant to Debtor describes the role of an insider. Mr. Anglin's role as advisor/consultant to Debtor's *quasi*-CEO and sole shareholder was described by Mr. Anglin as follows: Anglin would discuss matters with Dr. Mason, and would recom-

mend to Dr. Mason a course of action; Dr. Mason would decide; then, Anglin would coordinate efforts to execute Dr. Mason's decision.[10] Mr. Anglin's functions could be equated to that of a corporation's chief financial officer. Without question, Mr. Anglin was an individual "in control" of Debtor.

An insider who is also employed as a professional has a conflict of interest. Mr. Anglin's conflict of interest is illustrated by his testimony that, in several instances, he could not differentiate whether he was acting on behalf of Debtor or on behalf of Bridge. For example, in his negotiations with the auction company, Anglin was negotiating to obtain the payment to Bridge of 30% of the total auction commission. That 7%–3% commission split did not benefit Debtor but did benefit Bridge. From the perspective of CAT, other prospective auctioneers, creditors and parties in interest, however, Mr. Anglin was negotiating on behalf of Debtor.

■ The conflict of interest rules, which require that a professional be disinterested, are more strictly applied in the bankruptcy context than in other areas of law; such strict application assures the professional's undivided loyalty to the client, who is the debtor-in-possession, which loyalty is necessary because the debtor is a fiduciary for the estate and its creditors. *In re Rusty Jones, Inc.*, 22 BCD 306 (Bankr.N.D.Ill. 1991). Those rules are used to identify persons "who exhibit a risk of acting in a manner calculated to maximize their own interests at the expense of the interests of the estate." *In re Federated Dept. Stores, Inc.*, 114 B.R. 501, 504 (Bankr.S.D.Ohio 1990). As an insider, Mr. Anglin, and thus, Bridge Properties, is not disinterested and is disqualified from employment by Debtor as a professional.

■ Professionals seeking employment by a debtor in possession in a Chapter 11 bankruptcy case have a duty imposed by 11 U.S.C. § 327 and Bankruptcy Rule 2014 to affirmatively verify *facts* [11] showing disinterestedness. When making such disclosures, applicants are on notice that if facts are disclosed incorrectly or inadequately, or if changing facts and circumstances reveal an actual conflict, and the professional is later proved to be interested,[12] 11 U.S.C. 328 empowers the court to deny or reduce fees and expenses to the professional. *In re Roberts*, 46 B.R. 815 (Bankr.D.Utah 1985); *In re Western Office Partners, Ltd.*, 105 B.R. 631 (Bankr.D.Col.1989).

In the instant case, although Mr. Anglin as a layman may not be held to an intimate acquaintance with the Bankruptcy Code and Rules, he can be held to the standard of conduct of a reasonable, prudent, and honorable man. Whether he lied to Debtor's attorney about the connection with Bridge, or merely concealed the connection, the nondisclosure was intentional and material. Any allegation that Mr. Anglin could not have known that his role as advisor to Debtor and Debtor's principal would create a conflict of interest sufficient to disqualify him from employment by Debtor as a professional is incredible.

■ Additionally, such nondisclosure may alone be sufficient to deny Bridge compensation, even if the connection was not significant enough to disqualify Bridge. *See, In re Kendavis Industries International, Inc.*, 91 B.R. 742 (Bankr.N.D.Tex. 1988). This court will not engage in decision by hindsight, however. No one will ever know what objections might have been filed or what decision this court might have made *if* the proper disclosures had been made, for the disclosures were not made

---

**10.** Such decisions, of course, included Mr. Anglin's recommendation of employment of his own company to sell Debtor's real estate.

**11.** Unfortunately, the "boilerplate" affirmations made by too many such prospective professionals set forth the legal conclusions desired rather than the facts which would affirmatively support such conclusions. For example, an appli-

cation should disclose the relationships of the professional with the debtor's principal, related entities, creditors, or any other parties in interest as well as the amount and source of funds paid or promised. *See, In re Atlanta Sporting Club*, 137 B.R. 550 (Bankr.N.D.Ga.1991).

**12.** I.e., "not disinterested," within the meaning of 11 U.S.C. § 101(14).

until nearly a year after Mr. Anglin already had pocketed the estate's money.

 The objectors also allege as grounds for disqualification of Bridge that, at the time the auction took place, Mr. Anglin was a secured creditor of Debtor. Status as a creditor of the debtor is the first criteria in § 101(14) for finding a professional not disinterested. Disclosure of Mr. Anglin's status as a secured creditor should have been disclosed in an amended application for employment, which should have been filed in connection with the auction. At the time the services were performed for which Bridge now seeks compensation, Bridge was not disinterested. Section 327(c) clearly states that an interested professional cannot be employed by Debtor. Unambiguous statutory language cannot be disregarded. *Childress v. Middleton Arms, L.P.*, 934 F.2d 723 (6th Cir. 1991).

 Finally, a professional cannot recover fees for services rendered if he has not been authorized to so serve by a court order. *In re Leek*, 128 B.R. 832 (Bankr. M.D.Fla.1991); *In re Citrone Development Corp.*, 106 B.R. 359 (Bankr.S.D.N.Y.1989); *In re Northeast Dairy Cooperative Federation, Inc.*, 74 B.R. 149 (Bankr.N.D.N.Y. 1987); *In re Willamette Timber Systems, Inc.*, 54 B.R. 485 (Bankr.D.Or.1985). The testimony of both Mr. Anglin and Bill Mason clearly establishes that the commission from the sale of Debtor's property was not intended to compensate Mr. Anglin for his professional services as real estate broker or agent. In fact, neither he nor Bridge performed any compensable services as real estate broker. Bridge was not an exclusive agent and did not serve as broker of the sale of any of Debtor's property. Instead, the real estate commission was intended to compensate Mr. Anglin for his services as advisor and consultant to Debtor; said intent was not disclosed at the onset of the case or upon the filing of the Bridge application for employment.

 "A non-court appointed consultant at the helm of a debtor corporation postpetition does not comport with the letter nor spirit of managerial requirements set forth in § 1107 and § 1108 of the Code." *In re William A. Smith Construction Co., Inc.*, 77 B.R. 124 (Bankr.N.D.Ohio 1987); *In re WFDR, Inc.*, 22 B.R. 266 (Bankr.N.D.Ga. 1982). A person, regardless of his title, is a professional whose employment must be approved by the bankruptcy court if that person plays "a central and intimate role in the reorganization of the debtor's estate." *In re United Color Press, Inc.*, 129 B.R. 143 (Bankr.S.D.Ohio 1991). Debtor neither sought nor obtained approval of Mr. Anglin's employment as advisor and consultant to Debtor. Neither Anglin's employment as advisor/consultant nor his ownership of Bridge was disclosed. Therefore, Mr. Anglin is not entitled, by misdirection of compensation through an entity whose control was concealed, to compensation for employment which was not approved by the bankruptcy court.

 Additionally, *quantum meruit* recovery by Mr. Anglin is inappropriate. The services provided by Mr. Anglin in connection with the auction were not services for which Bridge was employed. Neither Bridge nor Mr. Anglin was the procuring cause of any sale of Debtor's property. *Glassmere Castings Co. v. Lu–Mac, Inc.*, 95 B.R. 389 (Bankr.W.D.Pa.1989); *Nelson–Rives Realty, Inc. v. Reider*, Case No. 85–20364 (Bankr.N.D.Ga.), *aff'd*, Case No. 1:89–CV–1381–RCF, 1979 WL 24679, (N.D.Ga.1989). Mr. Anglin's employment in connection with the auction was neither applied for nor approved. As noted above, Mr. Anglin's employment as advisor/consultant was likewise never applied for or approved. To provide that professionals must obtain approval of their employment by the bankruptcy court while simultaneously allowing compensation on a *quantum meruit* basis would be illogical. Additionally, it would so dilute the deterrent effect of denial of compensation as to render it meaningless. *See, In re Southern Diversified Properties, Inc.*, 110 B.R. 992 (Bankr.N.D.Ga.1990).

Accordingly, Mr. Anglin is directed to disgorge all funds paid to Mr. Anglin, to Bridge, to Patricia Bunn, to Ed West or to any entity controlled by Mr. Anglin, includ-

ing Williamsburg, Ltd. and Agnew Properties, and to pay said amounts into the Registry of the Court.

## DEBTOR ATTORNEY'S FINAL APPLICATION FOR COMPENSATION

 In the final application for compensation of Debtor's attorney (the "Final Application"), total compensation in the amount of $378,098 is sought. Debtor's attorney filed three interim applications for compensation: orders entered pursuant to those applications awarded a total of $323,977,[13] allowing payment of 90% thereof, or $294,079.30, and withholding payment of 10%, or $29,897.70, until the final application. The Final Application seeks payment of $54,121 for services not the subject of prior applications for compensation and seeks payment of the 10% holdback, for a total of $84,018.70. Debtor's attorney seeks reimbursement of expenses in the amount of $663.63.

The services sought to be compensated will be evaluated pursuant to the principles set forth in *Norman v. Housing Authority of City of Montgomery*, 836 F.2d 1292 (11th Cir.1988). The initial consideration in calculating the lodestar is that of a reasonable hourly rate. Based on this court's knowledge of prevailing market rates and an evaluation of the skill of the Applicant, the hourly rates which the Applicant seeks to charge are reasonable.

The other consideration in calculating the lodestar is hours reasonably expended. Hours which would be unreasonable to bill to a client irrespective of the skill of counsel must be excluded. *Id.* Hours expended on discrete and unsuccessful claims may be excluded. *Id.* The burden of proof is on the applicant to establish that the re-

quested rate is in line with prevailing market rates. *Id. Missouri v. Jenkins*, 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

Additionally, certain factors may require reduction or enhancement of the lodestar. *See, Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) and *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974). The factors set forth in *Johnson* may be relevant in adjusting the lodestar.[14]

The facts elicited in connection with the applications of Bridge and CAT are significant in a determination of the reasonableness of Debtor's attorney's final application for compensation. The filing of applications for employment of professionals and supervision of the sale of a debtor's property are important duties of the attorney for a debtor in possession in a Chapter 11 case. In the instant case, it appears that Debtor's attorney may have been less than diligent in fulfilling those duties.

The burden of obtaining employment of a professional is on the debtor. It is the debtor who seeks the services of the professional; it is the debtor who must file the application to employ the professional. As it is a debtor's duty to employ professionals, debtors, who generally are not legal professionals, must rely on the debtor's attorney to ascertain that duties such as applying for approval or employment and applying for compensation are properly performed.

 A debtor's attorney has a duty to make inquiries appropriate to determine any and all connections a professional might have which might reveal an adverse interest or render that professional not disinterested. Once such an investigation and the exercise of legal judgment is complet-

---

**13.** The first interim order, entered June 8, 1989, awarded $130,687.50. The second interim order, entered August 10, 1989, awarded $68,538. The third interim order, entered August 1, 1990, awarded $124,751.50.

**14.** The *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney

due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

ed, the employment process is semi-administrative and should not be difficult for a debtor's attorney to explain or implement. Although the debtor's attorney does not act as attorney for other professionals employed by the debtor, it is the debtor's duty to employ qualified professionals; it is incumbent upon a debtor not to intentionally employ an unqualified professional. It logically follows that the unintentional employment of an interested [15] professional is a breach of debtor's duty. Accordingly, it falls to the debtor's attorney to advise professionals of their responsibilities under the Bankruptcy Code and to advise them of the disclosures necessary to fulfill those responsibilities. Laymen as well as attorneys unfamiliar with the bankruptcy process under the Code may not understand the full spectrum, both the letter and the spirit, of the Chapter 11 debtor's fiduciary duty. In the instant case, however, Debtor employed one of the most experienced and respected bankruptcy firms in this area.

Debtor's attorney failed to ascertain whether Bridge met the standards of § 327 for employment as a professional. Debtor's attorney could not testify that he had thoroughly explained the terms "disinterested" or "adverse interest" to Mr. Anglin, Ms. Bunn or Mr. Norris. Debtor's attorney did not receive an affirmative disclosure disclosing the ownership of Bridge. The lead attorney delegated the preparation of the application to a junior associate, who undertook only perfunctory communication with Ms. Bunn, used the boilerplate affidavit usually used by the firm, and failed to perform the necessary investigation and legal analysis which is prerequisite

to use of a form.[16] Mr. Norris was not interviewed or even contacted.

Debtor's attorney also made no attempt to ascertain the expertise of Bridge to market Debtor's property beyond obtaining a representation from Mr. Anglin that the company was operated by friends of Mr. Anglin who would "do a good job." In fact, Bridge and its primary functionary, Ms. Bunn,[17] has little expertise in selling real estate, especially on the scale required by Debtor. Bridge had participated in only one sale while in operation, and that was a sale of property owned by Mr. Anglin, which sale appears to have been negotiated by Mr. Anglin, the non-licensed agent, rather than by Ms. Bunn or Mr. Norris.

In connection with the application of CAT for compensation, the evidence establishes that Debtor's attorney failed to provide any instruction to or supervision of CAT concerning the disposition of the proceeds of the auction. Debtor's attorney delayed eight months in filing an application for compensation of CAT. The application for compensation did not include an accounting. Debtor's attorney had not requested an accounting from CAT and, in fact, first discovered that CAT had made unauthorized disbursements at the hearing on CAT's application.[18]

■ In a Chapter 11 case, the debtor in possession has a fiduciary duty to act not in its own best interest, but rather in the best interest of the entire estate, including secured and unsecured creditors. *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *In re Doors and More, Inc.*, 126 B.R. 43 (Bankr.E.D.Mich.1991). As noted in the *Weintraub* case, this fidu-

---

**15.** I.e., "not disinterested," within the meaning of 11 U.S.C. § 101(14).

**16.** Indeed, the prevalence of such use of forms convince laymen that attorneys are not necessary; the practice demeans the profession.

**17.** The only licensed broker for Bridge, Mr. Norris, did nothing more than lend his name and license to Bridge to enable it to avoid contravention of Georgia law.

**18.** While this court makes no finding, it would appear that one of several scenarios is plausible: Debtor's attorney actually knew of the irregular-

ity of disposition of the auction proceeds; Debtor's attorney failed, from passivity, to perform the duties of an attorney for a debtor in possession, which led to the abuse which occurred; or Debtor's attorney attempted supervision but was rebuffed by the actual, behind-the-scenes control of Dr. Mason and Mr. Anglin, neither of whom ever appeared in court as Debtor's officer or representative. If the last scenario were true, Debtor's attorney's response should have been an application to withdraw.

ciary duty to creditors which inheres in the bankruptcy system causes fundamental changes in the nature of corporate relationships. The attorney for the debtor in possession is also a fiduciary to the estate. *Doors & More,* 126 B.R. 43.

■ The unique circumstances which surround insolvency and the filing of a Chapter 11 case place the attorney for the debtor in possession in the unusual position of sometimes owing a higher duty to the estate and the bankruptcy court than to his client. In fact, the status of the client and the attorney may often overlap in a Chapter 11 case, as the debtor's attorney must take conceptual control of the case and provide guidance for management of the debtor, not only to discern what measures are necessary to achieve a successful reorganization, but to assure that, in so doing, compliance with the Bankruptcy Code and Rules is sought rather than avoided. Debtor's attorney's duty as fiduciary of the estate requires an active concern for the interests of the estate and its beneficiaries. *In re Consupak, Inc.,* 87 B.R. 529 (Bankr. N.D.Ill.1988).

■ The attorney for a debtor in possession is not merely a mouthpiece for his client. "[C]ounsel for the estate cannot close their eyes when the debtor's principals are not acting in the best interests of the estate and its creditors, and certainly cannot aid the adverse activity." *In re Rusty Jones, Inc.,* 22 BCD 306 (Bankr. N.D.Ill.1991). Debtors and non-legal professionals are not expected to know that professionals cannot be paid without authorization unless debtor's attorney informs them of the Bankruptcy Code's strictures. *Robbins v. Schuyler (In re United Equipment Sale Co.),* 47 B.R. 818 (Bankr. W.D.Mich.1985). The debtor's attorney has a duty to oversee the disposition of assets of the estate to assure that the rights of debtor's creditors are protected.

In the instant case, Debtor's attorney failed in his responsibility to supervise the auction process. Funds were expended for improvement of the property. Those expenditures were clearly outside the ordinary course of business. *See, Burlington*

*Northern Railroad Co. v. Dant & Russell, Inc.,* 853 F.2d 700 (9th Cir.1988). Those expenditures were not authorized by the bankruptcy court. If the necessity for those improvements had been properly disclosed in advance to the court and to interested creditors, a different course of action may have resulted. At least the shortfall in payment to the secured creditors from the auction proceeds, which in fact occurred in this case, would not have come as such an unwelcome surprise. Had all the relevant facts been disclosed, it is possible that creditors' objections would not have been negotiated into an agreement and the auction may not have been approved.

Finally, Debtor's attorney testified that he was aware from the outset of the case of Mr. Anglin's involvement with Debtor and of his position as advisor/consultant to Dr. Mason and Debtor. Debtor's attorney, however, apparently never advised Debtor, Dr. Mason, or Anglin, that, regardless of whether Debtor may have funds with which to pay Mr. Anglin, Mr. Anglin's employment as advisor/consultant was subject to approval by the bankruptcy court. Debtor's attorney could have explained to Dr. Mason and Mr. Anglin that approval of such employment is required because Debtor's creditors have a right to know who is running the reorganization. *In re William A. Smith Construction Co., Inc.,* 77 B.R. 124 (Bankr.N.D.Ohio 1987). In the instant case, the law firm representing Debtor employs some of the most experienced bankruptcy professionals in this district. The failure of those attorneys to advise Debtor of the necessity of seeking and obtaining an order of employment for Mr. Anglin is difficult to comprehend and is, therefore, unsupportable.

In conclusion, in the instant case, the time expended by Debtor's attorney in connection with the application for compensation of Bridge Property, in the amount of $19,299, is disallowed as unnecessary; if Debtor's attorney had pursued the proper inquiries and instructions at the appropriate time, the extensive hearings and briefs would not have occurred. Additionally, as a result of Debtor's attorney's lack of at-

tention and failure to fulfill its duties, the lodestar will be reduced by $20,000.

Accordingly, it is hereby

ORDERED that CAT's application for compensation is approved in the amount of $287,422.58. Any amounts in CAT's possession in excess of this amount shall be deposited into the registry of the court. It is further

ORDERED that the application of Bridge Properties for compensation is denied; Gary Anglin is directed to disgorge all amounts paid by CAT to or on behalf of Mr. Anglin, Bridge Properties, Patricia Bunn, Ed West or to any entity controlled by Mr. Anglin, including Williamsburg, Ltd. and Agnew Properties, as compensation to Bridge and to pay said amounts into the registry of the court within 30 days of the date of entry of this order. It is further

ORDERED that the final application of Debtor's attorneys is approved in the amount of $338,799, $294,079.30 of which has been authorized for payment in prior interim compensation orders, resulting in a balance remaining to be paid of $44,719.70; reimbursement of expenses in the amount of $663.63 is approved.

IT IS SO ORDERED.