**In re Robert E. BRENNAN, Debtor.**

**In re FIRST JERSEY SECURITIES, INC., Debtor.**

**Bankruptcy Nos. 95–35502, 95–35503.**

United States Bankruptcy Court, D. New Jersey.

Sept. 29, 1995.

Gerald H. Gline, Cole, Schotz, Meisel, Forman & Leonard, Hackensack, NJ, for Robert E. Brennan.

Walter J. Greenhalgh, Mary Ann Dubiel, Robinson, St. John & Wayne, Newark, NJ, for First Jersey Securities, Inc.

Patrick W. Turner, Susan Jensen–Conklin, Newark, NJ, for U.S. Trustee.

Judith R. Starr, John L. Hunter, Washington, DC, Suzanne R. Dyer, U.S. Attorney's Office, Newark, NJ, for Securities and Exchange Commission.

James B. McKinney, Jr., Deputy Attorney General, Department of Law and Public Safety, Newark, NJ, for New Jersey Bureau of Securities.

James Scarpone, Hellring, Lindeman, Goldstein & Siegal, Newark, NJ, for Creditors Committee in Brennan Case.

Charles F. Vihon, Much, Shelist, Freed, Denenberg & Ament, P.C., Chicago, IL, for N.J. Class Action (Hibbard Brown).

Daniel E. Bacine, Barrack, Radius & Bacine, Philadelphia, PA, for Barrack, Radius & Bacine.

Joel Sterns, Jeffrey Posta, Sterns & Weinroth, P.C., Trenton, NJ, for Sterns & Weinroth, P.C.

Lawrence A. Whipple, Jr., Connell, Foley & Geiser, Roseland, NJ, for Seton Hall University.

### MEMORANDUM OPINION

STEPHEN A. STRIPP, Bankruptcy Judge.

This is the court's decision on applications by the debtors-in-possession in both of the above cases to employ Mortenson & Associates, P.C., as accountants, and by First Jersey Securities, Inc. to employ Robinson, St. John & Wayne as its attorneys.[1] The United

---

1. Although these cases are related, no application has been filed for joint administration.

States trustee and the Securities and Exchange Commission objected on the grounds that these professionals have conflicts of interest which preclude their employment by the debtors-in-possession. The New Jersey Bureau of Securities joined in the objection to the retention of Mortenson & Associates, P.C. This court has subject matter jurisdiction under 28 U.S.C. §§ 1334(b), 151 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). For the reasons which follow, the objections are overruled and the applications are granted. This shall constitute the court's findings of fact and conclusions of law.

## FINDINGS OF FACT

These cases were commenced by the filing on August 7, 1995 of voluntary petitions for relief under chapter 11 of title 11, United States Code (hereinafter "Bankruptcy Code" or "Code"). Debtor Robert E. Brennan (hereinafter "Brennan") described his business in his petition as owner, operator and chief executive of various businesses engaged in the horse racing or breeding industry. In addition, Brennan manages his personal investments and performs business consulting services. The schedules filed with Brennan's bankruptcy petition state that he owns assets with a value of $90,110,156, and has liabilities of $85,640,452.

Debtor First Jersey Securities, Inc. (hereinafter "First Jersey") stated in its petition that it was previously a registered broker/dealer, but is presently inactive. The schedules filed with First Jersey's bankruptcy petition state that it has assets with a value of $22,367, and liabilities of $75,314,145. Brennan owns 100% of the stock of First Jersey.

The primary liability of the debtors is the judgment against them jointly and severally in favor of the Securities and Exchange Commission (hereinafter "SEC") for $75,000,000 for perpetrating a fraud on their brokerage customers. The pendency of a deadline to pay that judgment, which was entered in the U.S. District Court for the Southern District of New York, was the reason for the filing of the bankruptcy petitions. The debtors are appealing the judgment to the U.S. Court of Appeals for the Second Circuit.

### The Applications to Employ Mortenson & Associates

Both debtors filed applications to employ Mortenson and Associates, P.C. (hereinafter "Mortenson") to render accounting services. The affidavits of Robert J. Weir (hereinafter "Weir") in support of both applications note that Mortenson provides accounting services to both debtors. Weir's affidavit in support of the application to employ Mortenson in the Brennan case also states in paragraph 4 that

[a]s general accountants to the Debtor, Mortenson also provides accounting services to various other entities in which the Debtor retains an interest. To the best of my knowledge, those entities do not hold or represent an adverse interest to the estate.

Both affidavits also state that to the best of Weir's knowledge, Mortenson does not hold or represent an interest adverse to either estate and is a disinterested person within the meaning of Bankruptcy Code section 327.

The U.S. trustee objected to both applications, asserting that (1) insufficient information was provided in the applications to determine whether Mortenson represents an interest adverse to either estate and is a disinterested person within the meaning of Bankruptcy Code sections 327(a) and 101(14); (2) the simultaneous representation of both debtors may present a conflict of interest in violation of Code section 327(a), in part because the schedules disclose eight creditors which the debtors have in common; and (3) the simultaneous representation of Brennan and the "various other entities" referred to by Weir as quoted above may present a conflict of interest in violation of Code section 327(a).

The SEC joined the U.S. trustee's objections, and added that the SEC's pending motions for appointment of a trustee in these cases may moot the need for consideration of the applications. The motions for appoint-

However, because many of the facts alleged and legal arguments raised are the same in both cases, the court will enter this as a joint opinion, filing separate originals in each case.

ment of a trustee have since been resolved by entry of consent orders directing the appointment of an examiner under Code section 1104 in the Brennan case. The examiner will also investigate the financial affairs of First Jersey.

The court conducted a telephonic conference on August 15, 1995 to set a schedule for the filing of further papers on these objections and a hearing on August 24, 1995.

A supplemental certification was then filed in the Brennan case by Dennis Gaito (hereinafter "Gaito"), a principal in Mortenson, listing nine entities owned by Brennan to which Mortenson provides accounting services, including First Jersey. Gaito's affidavit states that he is also a co-trustee for three separate trusts in which Brennan's children, but not Brennan, have beneficial interests. Gaito's affidavit also states that Mortenson provides accounting services to a "PAB Trust" from which Brennan leases property. The affidavit adds further that Mortenson is the auditor for two public companies in which Brennan owns stock, namely International Thoroughbred Breeders, Inc. and Chef's International, Inc. Mortenson is also auditor for Primedex Health Systems, Inc., certain shares of which Brennan sold on June 5, 1995. Brennan has a note receivable in the amount of $700,000 from a third party who purchased the stock. Gaito's certification concludes in paragraph 6 that

> [i]t is important to emphasize to the Court that none of the related entities set forth above are creditors of the Debtor or owe money to the Debtor. In addition, the Debtor is not owed any money by First Jersey and First Jersey owes no money to the Debtor.

First Jersey adopted the Gaito certification filed in the Brennan case in support of the application to employ Mortenson in First Jersey as well.

The SEC argued in reply that the Gaito certification leaves many questions unanswered concerning Mortenson's representation of entities whose interests appear to the SEC to be adverse to the debtors, and Mortenson's involvement in transactions that the SEC believes may compromise Mortenson's ability to exercise independent judgment on behalf of the estates. The SEC then lists a number of relationships and transactions which it believes require close scrutiny, with which Mortenson has been involved.

The hearing on these objections commenced on August 24, 1995. At a point more than three hours into a four-hour hearing, when the court had commenced rendering a ruling from the bench on the objections, a Deputy Attorney General representing the New Jersey Bureau of Securities (hereinafter "Bureau of Securities") interrupted the ruling and blurted out that the Bureau of Securities also opposes the applications to employ Mortenson because Mortenson was involved in transactions in which Brennan transferred $16,750,000 to Swiss bank accounts. The Bureau of Securities had not filed any opposition to the applications or informed anyone until the court commenced its ruling that it opposed the applications. The debtors' attorneys vehemently objected to the timing of the Bureau of Securities' statement, as did the court. The Deputy Attorney General replied that the subject information had been under seal in state court proceedings until several days earlier. While that fact did not explain or justify waiting until the court commenced its ruling to raise the objection, the factual allegations were sufficiently serious to warrant an adjournment of the hearing to require the Bureau of Securities to put their allegations in writing, and to give the other parties an opportunity to respond. The hearing was therefore adjourned to August 30, 1995. Thereafter, the Bureau of Securities filed an objection stating, without explanation or elaboration, that "Dennis Gaito, an accountant and principal in Mortenson & Company, a/k/a/ Mortenson and Associates, authorized and participated in transfers which resulted in $13,750,000 and $3,000,000 of funds of entities in which debtor Robert E. Brennan has an interest being moved out of this country." The Bureau of Securities relied on annexed documentary exhibits to support this allegation.

Papers filed in opposition by Brennan include a certification of the debtor that the transfers in question were on behalf of two trusts which Brennan established as part of decedent's estate planning. The certification

states that Brennan was informed in early January 1993 that he had heart disease which would require surgery. He then established the two trusts in question. On January 22 through 26, 1993 he made the transfers in question which funded the trusts. He entered the hospital on January 25, 1993 and had two surgical procedures over the next two weeks. Brennan states that the value of his assets at the time exceeded $172,000,000, his liabilities were insignificant, and the transfers had nothing to do with litigation commenced by the SEC on January 21, 1993 against other parties. He denies any wrongdoing by himself or his accountants.

The court conducted a second hearing on the objections to the employment of Mortenson on August 30, 1995. The objections to employment of Mortenson by both debtors were overruled and the applications were granted. This opinion sets forth the reasons for those rulings, as initially stated from the bench on August 24 and 30, 1995.

### The Application to Employ Robinson, St. John & Wayne

Brennan applied for an order authorizing him to employ Robinson, St. John & Wayne (hereinafter "Robinson") as special counsel under Code section 327(e) to represent him in pending litigation with the New Jersey Bureau of Securities. There was no objection to that application and an order was entered in the Brennan case on August 17, 1995, authorizing such employment.

In addition, First Jersey applied for an order authorizing employment of Robinson under Code section 327(a) as its general bankruptcy counsel. The affidavit of Walter J. Greenhalgh, Esq., (hereinafter "Greenhalgh") of Robinson in support of that application discloses that Robinson was representing First Jersey, and in some cases Brennan as well, in five lawsuits when the bankruptcy cases commenced, including the litigation with the SEC which gave rise to the $75,000,-000 judgment. The affidavit notes that Brennan is the sole shareholder of First Jersey, and states that no conflict of interest exists.

Greenhalgh's affidavit also states that First Jersey transferred 200,001 shares of stock in International Thoroughbred Breeders, Inc. (hereinafter "the ITB securities") in payment of a retainer of $200,000 and in partial payment of the amount of approximately $389,327 due for prepetition services. The ITB securities are publicly traded, and were trading at approximately $4.00 to $4.25 per share. However, transfer of the ITB securities received by Robinson is apparently restricted, so the amount which Robinson will ultimately realize for the shares has not been ascertained. First Jersey and Robinson have agreed that when Robinson sells the shares, it will apply $200,000 of the proceeds to its retainer for services to be rendered in First Jersey's bankruptcy case. It will also apply an amount up to another $250,000 to the amount which it is owed for prepetition services. So the maximum which Robinson may retain from the sale of the securities is $450,000. If Robinson receives more than $450,000 from the sale of the ITB securities, it will refund the excess to First Jersey. Any part of Robinson's prepetition claim which is not paid in this manner is unconditionally waived by Robinson. If Robinson receives less than $200,000 from the sale of the ITB securities, the affidavit states that Robinson reserves its right to seek payment of the balance of the retainer from First Jersey.

Greenhalgh confirmed on the record on August 24, 1995 that the transfer of the ITB securities was not intended to be security for Robinson's prepetition claim, but in full payment thereof.

The U.S. trustee objected to First Jersey's application to employ Robinson. The bases for the objection were first, that Robinson is a prepetition creditor of the debtor and therefore is not a disinterested person as required by Code section 327(a), and second, that there was insufficient disclosure as to whether Robinson's simultaneous representation of First Jersey as general counsel and Brennan as special counsel created a disqualifying conflict of interest. The SEC joined the U.S. trustee's objection.

Robinson filed a reply certification of Greenhalgh providing more detailed informa-

tion regarding the matters in which it has represented First Jersey, Brennan and related entities, and concluding that there is no conflict of interest. The reply certification also states with respect to the transfer of securities that it was payment in the ordinary course of business in a timely manner, and would not be deemed preferential under Code section 547.

The U.S. trustee replied that the payment on account of Robinson's prepetition claim appeared to be an avoidable preference under Code section 547, and that this created a disqualifying conflict of interest under Code section 327(a). The SEC replied that the payment on account of the prepetition debt appears to be a preference, and the payment of a $200,000 retainer may constitute a fraudulent conveyance. The Bureau of Securities took no position on the application to employ Robinson.

The court overruled the objections and granted the applications at the hearing on August 24, 1995. This opinion sets forth the reasons for that ruling, as initially stated from the bench on August 24th.

### CONCLUSIONS OF LAW

#### I. *The applications to employ Mortenson & Associates*

##### 1. *The Duty of disclosure*

■ As previously noted, the affidavits of Robert J. Weir in support of the applications to employ Mortenson in both cases note that Mortenson provides accounting services to both debtors, and that Brennan owns 100% of the stock of First Jersey. Weir's affidavit in support of the application to employ Mortenson as accountants in the Brennan case states in regard to Mortenson's relationship with entities related to the debtor as follows:

> [a]s general accountants to the Debtor, Mortenson also provides accounting services to various other entities in which the Debtor retains an interest. To the best of my knowledge, those entities do not hold or represent an adverse interest to the estate.

The U.S. trustee and the SEC properly objected that the affidavits of Weir did not contain sufficient information about the relationships between the debtors, and between Brennan and the unidentified entities mentioned in the quoted sentence, for the court and parties in interest to evaluate the relationships. Mortenson then provided much more information in the affidavit of Dennis Gaito. The U.S. trustee replied in part that the additional information provided in response to the objection should have been provided in the first place. The court agrees.

■ Fed.R.Bankr.P. 2014(a) requires, in pertinent part, that in applications for employment under Code section 327 the professional must disclose all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, and the U.S. trustee. In addition, the case law is abundantly clear that *any* relationship or fact which might create a disqualifying conflict of interest must be disclosed. *See e.g., In re BH & P, Inc.,* 103 B.R. 556, 567 (Bankr.D.N.J.1989), *aff'd in part & rev'd in part on other grounds,* 119 B.R. 35 (D.N.J.1990), *aff'd,* 949 F.2d 1300 (3d Cir.1991). *See also In re Park–Helena Corp.,* 63 F.3d 877 (9th Cir. 1995) (debtor's attorney was denied compensation for failing to disclose that $150,000 retainer was paid by the debtor's president rather than the debtor). Such disclosure must, at a minimum, include the existence, nature and extent of any claims between related debtors. In addition, there must also be disclosure of the identities of any other parties in interest or related persons whom the professional also represents, the nature and extent of the relationship between that person and the debtor, and between that person and the professional, and any facts which might be construed as creating actual or potential conflicts of interest.

It follows that the boilerplate disclosure quoted above which Mortenson initially provided did not fulfill its duty of disclosure. *See In re Leslie Fay Cos., Inc.,* 175 B.R. 525, 537 (Bankr.S.D.N.Y.1994); *In re Micro–Time Mgmt. Systems, Inc.,* 102 B.R. 602, 606–07 (Bankr.E.D.Mich.1989); *In re Gray,* 64 B.R. 505, 508 (Bankr.E.D.Mich.1986). The U.S. trustee therefore provided a service

not only to the court and the parties in interest in the case, but to Mortenson as well, by objecting to the extent of disclosure, and thereby prompting Mortenson to provide further disclosure before the court ruled on the applications for employment.

### 2. *The Extent of The Determination Required on Applications for Employment Where Facts Regarding the Relationships are Contested or The Relationships Warrant Investigation*

■ The U.S. trustee and the SEC argue that even with the additional information provided in the Gaito affidavit as summarized above, there is still not sufficient information to determine if Mortenson has or represents any interests which disqualify it for employment under Code section 327(a). The U.S. trustee and SEC argue that the complex relationships among the debtors and the related entities mentioned in the Gaito certification warrant a thorough investigation which may disclose conflicts which disqualify Mortenson. The debtors and Mortenson reply that there are no claims between the debtors, or between the debtors and the related entities which Mortenson represents. They deny that Mortenson holds or represents any interests adverse to the estates, or that Mortenson has any actual or potential conflicts.

The New Jersey Bureau of Securities adds that the January 1993 transfers of $16,750,-000 to two trusts created by Brennan, in which Mortenson participated, may have been unlawful and Mortenson should be disqualified for that reason. Brennan replies that the transfers were part of perfectly proper decedent's estate planning in preparation for heart surgery.

The court concludes that sufficient information has been provided by the debtors and Mortenson to rule on the applications, for these reasons.

■ The circumstances in which the court is required to rule on applications to employ professionals in bankruptcy cases dictate that the court make such decisions promptly. The case cannot proceed effectively until the debtor in possession, and any creditors com-

mittee or trustee, has employed the professionals who are usually essential to proper prosecution of the case. If the court were required to finally determine contested facts, or wait for an exhaustive examination of complex relationships, before ruling on an application for employment, the debtor and the professionals would have to bear the risk, for months, or even years in some cases, that the court might ultimately deny the applications. In that case, the professionals could be denied compensation for months of services and disbursements, and the debtor would have to incur the delay and added expense of employing new professionals who would have to learn about a case which had been in progress for some time.

■ Automatic disapproval of applications for employment involving contested facts or relationships warranting thorough examination is not an acceptable solution either. As will be discussed at more length later, there is a presumption that a party should be entitled to the professionals of the party's choice, and that presumption has added weight where the relationship between the party and the professional is of long standing and they are in the middle of complex, protracted litigation with other parties.

■ The best solution in such circumstances is for the court to determine if the debtor has made a prima facie showing that the professional meets the criteria for employment under Code section 327. If so, then the burden shifts to an objecting party to make a prima facie showing of facts which probably constitute cause for disqualification. The record on these applications is sufficient for the court to make that determination. *See In re Allegheny Int'l, Inc.,* 117 B.R. 171, 179 (W.D.Pa.1990) ("[t]he Bankruptcy Code does not impose an obligation upon the bankruptcy court to hold an evidentiary hearing prior to approving the employment of a 'professional person.' ")

■ This approach is also supported by Code section 328(c), which provides that the court may deny compensation to a professional employed by a trustee, debtor in possession or creditors committee if, at any time during such employment, such professional

"is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed." *Id.* This section acknowledges that the court may determine after employment that a professional falsely represented that he, she or it has no disqualifying conflict of interest, and deny compensation as a result. This places the burden on the professional to thoroughly disclose all facts relating to actual or potential conflicts, and to accurately certify the absence of any conflicts within the meaning of Code sections 327 and 1103.

### 3. *The Factual Allegations of The Parties*

■ Applying the aforementioned test to these facts, we find the following. The debtors wish to employ Mortenson, their accountant of many years,[2] to assist in the prosecution of this case. Mortenson has certified that the debtors have no claims against each other, there are no claims between the debtors and the related parties which Mortenson represents, and Mortenson and the debtors have no claims against each other. These certified allegations meet the debtor's burden of making a prima facie showing that Mortenson does not hold or represent any interest adverse to the estate, is a disinterested person within the meaning of Code section 101(14), and is therefore qualified under Code section 327(a) to represent the debtors. The burden then shifts to the objecting parties to make a prima facie showing of disqualifying facts.

■ However, the U.S. trustee and the SEC do not allege any *facts* other than those offered by the debtors and Mortenson. The only fact to which they refer to rebut the debtors' conclusion is that the PAB Trust, to which Mortenson provides accounting services, is Brennan's landlord. From this the U.S. trustee infers that the PAB Trust must be a creditor, and that Mortenson cannot represent both Brennan and the PAB Trust.

However, there is no evidence that Brennan owed any rent to the PAB Trust when the petition was filed, and if he didn't, the PAB Trust is not a creditor under the definitions in Code sections 101(10) and 101(5). It certainly is a party in interest, but it wouldn't be a creditor. Moreover, even if the PAB Trust is a creditor, that fact is not necessarily disqualifying under Code section 327(c) unless there is an actual conflict of interest. *In re BH & P, Inc.*, 949 F.2d at 1314. No proof has been offered, or argument made, as to how the relationship between Brennan and the PAB Trust creates an actual, or even a potential, conflict of interest in this case.

■ The Bureau of Securities raised factual allegations regarding the transfer by Brennan with Mortenson's assistance of $16,-750,000 to two trusts, which the Bureau suggests was improper (it didn't say how or why). However, Brennan certified an explanation of facts in rebuttal which, if proven, would probably defeat any argument that the transfer of those funds was fraudulent under federal or state law (no other argument was suggested or comes to mind as to how those transfers could have been unlawful under some other legal theory.)

It follows that as far as factual allegations and evidence are concerned, the governmental agencies which object to Mortenson's employment have not made a prima facie showing of anything which disqualifies Mortenson.

### 4. *The Application of BH & P to This Case*

■ The U.S. trustee and the SEC also argue that although they cannot point to any facts other than those described above, the duties of an accountant for a debtor in possession are such that Mortenson will have to investigate the relationships and transactions described above. The U.S. trustee and the SEC rely primarily on the case of *In re BH & P, Inc., supra,* for this argument.

**2.** There is an inconsistency with respect to how long Mortenson has represented Brennan individually. In its brief in support of Brennan's retention of Mortenson, filed on August 21, 1995, Brennan's counsel noted that Mortenson has represented Brennan individually since approximately 1982. *Id.* at 3. However, in its brief in further support of Brennan's retention of Mortenson, filed on August 30, 1995, Brennan's counsel indicates that Mortenson has represented Brennan individually for 21 years.

### (a) *The Facts of BH & P*

In *BH & P*, the trustee for three related chapter 7 estates employed the same attorneys and accountants in all three cases. At the time the trustee applied for orders authorizing employment of the professionals in the two cases of the individual shareholders of the corporate debtor, he knew that the estate of the corporate debtor had a large, contested claim against the estates of its shareholders. Indeed, he filed such claims himself on behalf of the corporate debtor against the estates of the individual debtors. He and his counsel thought the problem of these claims was sufficiently serious that when the U.S. trustee appointed the same trustee in the two, later-filed cases of the shareholders, his counsel consulted with the U.S. trustee about the issue. The U.S. trustee advised essentially that the claims created only a potential conflict which could be dealt with later if necessary. On that basis, the case trustee applied in the individual cases to employ the same attorney and accountant who he had employed in the corporate case. However, the applications for employment failed to disclose the existence of the claim by the corporate estate against the individual estates.

### (b) *The Decision in BH & P*

When the breach of the duty of disclosure became known to this court, the court determined that the trustee and his professionals had an actual conflict of interest in representing all three estates, removed the trustee and professionals from the shareholders' cases, and denied them compensation for those cases. *In re BH & P, Inc.*, 103 B.R. at 573–74. The district court essentially affirmed, reversing only this court's finding that the breach of the duty of disclosure was knowing and intentional. *In re BH & P, Inc.*, 119 B.R. at 44–45. The district court remanded for reevaluation of the issue of compensation where the failure to disclose is not knowing and intentional. *Id.* at 45.

The U.S. Court of Appeals for the Third Circuit affirmed the district court. In analyzing the standards for disqualifying professionals under Code section 327 on the basis of conflicts of interest, the Court of Appeals held:

... we reiterate that 'historically, bankruptcy courts have been accorded wide discretion in connection with ... the terms and conditions of the employment of professionals,' ... and affirm that the conflict of interest principles which we have adopted regarding disqualification of trustees apply with equal force in those situations involving employment of professionals. This flexible approach will require the bankruptcy courts to analyze the factors present in any given case in order to determine whether the efficiency and economy which may favor multiple representation must yield to competing concerns affecting fairness to all parties involved and protection of the integrity of the bankruptcy process. Factors to be considered include, but are not limited to, the nature of disclosure of the conflict made at the time of appointment, whether the interests of the related estates are parallel or conflicting, and the nature of the interdebtor claims made. As we have said, denomination of a conflict as 'potential' or 'actual' and the decision concerning whether to disqualify a professional based upon that determination in situations not yet rising to the level of an actual conflict are matters committed to the bankruptcy court's sound exercise of discretion.

*In re BH & P, Inc.*, 949 F.2d at 1316–1317 (quoting *In re Martin*, 817 F.2d 175, 182 (1st Cir.1987)). The Court of Appeals then determined that this court did not abuse its discretion in disqualifying the professionals in that case. *Id.* at 1317.

### c. *The Differences Between BH & P and These Cases*

However, the facts in *BH & P* differ from the facts in the Brennan and First Jersey cases in a number of material ways:

(1) In *BH & P* there was a large, contested claim by one debtor against the others. The Court held that it was an actual conflict of interest for the same trustee and professionals to prosecute the claims on behalf of the corporate estates, and defend the claims on behalf of the shareholders' estates. *Id.* at 1315. In the Brennan and First Jersey

cases, there is no evidence of any interdebtor claims at all.

(2) In *BH & P* the trustee and professionals considered the interdebtor claims to be sufficiently serious that they consulted with the U.S. trustee as to whether there was a disqualifying conflict. *Id.* at 1304 n. 6. However, they failed to disclose the existence of the claims to the court in the applications for employment. *Id.* at 1303–04. The problem didn't come to the court's attention until a later fee application. *Id.* at 1304. In the Brennan and First Jersey cases, although the initial disclosure was insufficient, the problem was rectified before the court ruled on the applications for employment, and no disqualifying facts have come to light.

(3) In *BH & P* the cases were under chapter 7 of the Code, in which the trustee is the only fiduciary.[3] A chapter 7 trustee must investigate the financial affairs of the debtor. Code section 704(4).

However, comparison of the duties of a chapter 7 trustee with those of a chapter 11 debtor in possession, creditors committee, examiner and trustee reveals that the duties of a chapter 7 trustee are split in chapter 11 among the debtor in possession, creditors committee, and examiner if any.

The duties of a debtor in possession are as follows:

(i) be accountable for all property received. Code sections 704(2), 1106(a)(1) and 1107(a);

(ii) examine proofs of claim and object to the allowance of any claim that is improper. Code sections 704(5), 1106(a)(1) and 1107(a);

(iii) furnish information concerning the estate and its administration as requested by parties in interest. Code sections 704(7), 1106(a)(1) and 1107(a);

(iv) file with the court, the U.S. trustee and taxing authorities periodic reports and summaries of the operations of the debtor's business. Code sections 704(8), 1106(a)(1) and 1107(a);

(v) make a final report and file a final account of the administration of the estate with the court and the U.S. trustee. Code sections 704(9), 1106(a)(1) and 1107(a).

(iv) as soon as practicable, file a plan, or a report why there won't be a plan, or seek conversion to a chapter 7 or dismissal of the case. Code sections 1106(a)(5) and 1107(a).

(vii) file tax returns and such information as taxing authorities may require. Code sections 1106(a)(6) and 1107(a); and

(viii) after confirmation of a plan, file such reports as are necessary or as the court orders. Code sections 1106(a)(7) and 1107(a).

By contrast, the duties of a creditors committee include:

(i) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor. Code section 1103(c)(2); and

(ii) participate in the formulation of a plan. Code section 1103(c)(3).

The duties of an examiner are:

(i) except to the extent that the court orders otherwise, investigate the acts, conduct, assets, liabilities, and financial condition of the debtor. Code sections 1106(a)(3) and 1106(b); and

(ii) file a statement of such investigation. Code sections 1106(a)(4) and 1106(b).

It follows that the governmental agencies are incorrect in their argument that the professionals employed by Brennan and First Jersey have a duty to investigate the debtors' relationships with each other and their affiliates, and that such professionals cannot also represent such affiliates. Such investigation is the duty of the creditors committee and the examiner, not the debtors.

### 5. *There is No Evidence That Mortenson Holds or Represents an Interest Adverse to Either Estate*

 Code sections 327(a) and 1107(a) authorize a debtor in possession to employ professional persons who do not hold or rep-

---

**3.** There can be creditors committees in chapter 7, *see* Code section 705, but they cannot employ professionals, and I have never seen or heard of a case which had a chapter 7 creditors committee.

resent an interest adverse to the estate. The term "adverse interest" is not defined by the Code. However, one often-cited definition which suffices for present purposes is as follows:

> [t]o 'hold an interest adverse to the estate' means (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.
>
> To 'represent an adverse interest' means to serve as agent or attorney for any individual or entity holding such an adverse interest.

*In re Roberts*, 46 B.R. 815, 827 (Bankr. D.Utah 1985), *aff'd in part and rev'd in part on other grounds*, 75 B.R. 402 (D.Utah 1987).

■ The governmental agencies have offered no evidence as to how Mortenson's or Gaito's relationships with the debtors and their affiliates constitute (a) possession or assertion of any economic interest that would tend to lessen the value of either estate; (b) possession or assertion of any economic interest that would create a dispute in which either estate is a rival claimant; (c) possession of a bias against either estate; or (4) representation of an entity holding such an adverse interest. Suspicions and innuendo are not evidence.

#### 6. *There is No Evidence That Mortenson Is Not a Disinterested Person*

■ A professional employed under Code section 327(a) must also be a disinterested person. Code section 101(14) defines "disinterested person" as follows:

> 'disinterested person' means person that—
>
> (A) is not a creditor, an equity security holder, or an insider;
>
> (B) is not and was not an investment banker for any outstanding security of the debtor;
>
> (C) has not been, within three years before the date of the filing of the petition, an investment banker for a security of the debtor, or an attorney for such an invest-

ment banker in connection with the offer, sale, or issuance of a security of the debtor;

> (D) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor or of an investment banker specified in subparagraph (B) or (C) of this paragraph; and
>
> (E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason[.]

Once again, the governmental agencies have offered no evidence that Mortenson fails to meet the definition of a disinterested person.

#### 7. *Code Section 327(c) Is Not Applicable*

Code section 327(c) provides in substance that representation of a creditor does not disqualify a professional for employment under section 327(a) unless such representation creates an actual conflict of interest. In these cases the only debtor/creditor relationship which is alleged is that Brennan leases real property from the PAB Trust, which Mortenson represents. However, the PAB Trust is not listed in Brennan's schedules as a creditor. The PAB Trust is listed as a party to an unexpired lease with Brennan, but that doesn't make it a creditor of Brennan's. Moreover, Code section 327(c) provides that representation of a creditor is not disqualifying unless there is an actual conflict of interest. The U.S. trustee and SEC have not shown any evidence that Mortenson would have an actual or potential conflict of interest in representing both Brennan and the PAB Trust even if the PAB Trust was a creditor.

#### 8. *Presumption In Favor of Professionals of Choice*

■ As discussed at greater length hereinafter in regard to First Jersey's employment of Robinson, there is a presumption in

favor of a party's right to counsel of choice. *Panduit Corp. v. All States Plastic Manufacturing Co., Inc.,* 744 F.2d 1564, 1576–77 (Fed. Cir.1984). The court sees no reason why there should be any less of a presumption in favor of a party's right to an accountant of choice. That presumption has added weight where, as here, the parties have employed the accountant in question for many years, and the accountant has handled extensive and complex financial matters for the parties which has resulted in a substantial accumulation of knowledge which will be useful in administration and prosecution of these cases.

### 9. *The Tactical Benefits of Disqualifying an Adversary's Professionals*

 The motivation of those who object to employment of professionals is also a proper subject of consideration by the court. The SEC and the Bureau of Securities are adversaries of the debtors in hotly contested, complex litigation. The U.S. trustee is not a party to such litigation, but the U.S. trustee and the SEC appear to be working in concert in these matters. Parties sometimes perceive a tactical or psychological advantage in disqualifying an adversary's professionals of choice. Such tactics are not to be condoned. The court did note at the hearing that the case law on conflicts in bankruptcy cases is sufficiently confusing that the governmental agencies may well have had a good faith belief that Mortenson should be disqualified for reasons other than some tactical advantage. Regardless of the motivation for such objections, however, disqualification of professionals is not a decision which should be made lightly, especially where the professionals' services are necessary to the continuation of pending litigation with the objecting parties.

### 10. *The Fiduciary Duty of Professionals for a Debtor in Possession*

 It is axiomatic that professionals employed by a trustee or debtor in possession have a fiduciary duty to the estate. *See e.g. In re Bonneville Pacific Corp.,* 147 B.R. 803, 805 (Bankr.D.Utah 1992). This is especially true for the attorney for the trustee or

debtor in possession. *In re Sky Valley, Inc.,* 135 B.R. 925, 933 (Bankr.N.D.Ga.1992). It has therefore been held, for example, that the attorney for a debtor in possession must advise about and oversee the employment of other professionals by the debtor, and ensure that estate funds are not spent out of the ordinary course of business without court authorization. *Id.* at 939. The fiduciary duty of the debtor's professionals is essentially to assist the debtor in fulfilling his fiduciary duty and to take action if the debtor fails to do so in a manner which is detrimental to the estate. Sometimes the required action may be simply to point out to the debtor an apparent breach of his duty. In other, more serious cases, such as conversion by the debtor of estate property, the professionals will sometimes be obligated to report the debtor's breach to others. However, the fiduciary duty of the debtor's professionals is derivative of the debtor's fiduciary duty. Since, as noted above, a debtor in possession has no duty to investigate his own financial affairs, it follows that his professionals have no such duty either.

 The ultimate concern expressed in the statutory and case law on employment of professionals in bankruptcy cases is the integrity of the bankruptcy process. *See In re BH & P, Inc.,* 949 F.2d at 1316. However, in the courts' zeal to ensure such integrity, it is possible to overlook a simple, basic fact: no matter who the professionals are, it is the client who makes the ultimate decision as to the positions taken in the matters for which the professionals are employed. Where the same individuals control related parties, those parties will act in concert in their mutual interests. Subject to the fiduciary duty of estate professionals and the Rules of Professional Conduct, in the case of attorneys, attorneys have a duty of loyalty to their clients. *See e.g., In re Designaire Modular Home Corp.,* 517 F.2d 1015, 1018 (3d Cir.1975) (determining that attorney for the debtor "must owe his first loyalty to his client, and the client must be free to make the choice of counsel."); *Bagdan v. Beck,* 140 F.R.D. 650, 653 (D.N.J.1991) (noting that "[l]oyalty is an essential element in the lawyer's relationship to a client."); *In Ziegel-*

*heim v. Apollo,* 128 N.J. 250, 261, 607 A.2d 1298, 1303 (1992) (finding that once a lawyer accepts a case, he or she "agrees to pursue the goals of the client to the extent the law permits, even when the lawyer believes that the client's desires are unwise or ill-considered."); *In re Dolan,* 76 N.J. 1, 9, 384 A.2d 1076, 1079 (1978) (noting that an attorney owes complete and undivided loyalty to the client). Accountants also have a duty of loyalty to their clients, subject to their own Rules of Professional Conduct. *See e.g.,* N.J. ADMIN.CODE tit. 13, §§ 29–3.1 to .16 (1982). Therefore, whether related parties controlled by the same individuals have the same professionals or different professionals, the positions asserted by such parties will tend to be the same. In such circumstances, requiring related parties to have different professionals is often nothing more than insisting on a deceiving appearance of separateness at great added expense.

The ultimate conflict of interest problem in chapter 11 cases is the tension between the concept of a debtor in possession as fiduciary and the reality that the debtor usually seeks to further its own interests at the expense of its creditors. The objections based on alleged conflicts of professionals in such situations often reflect confusion about the real problem, which is creditor mistrust *of the debtor, and therefore* of his, her or its professionals. However, unless such mistrust is sufficiently serious to warrant appointment of a trustee, requiring related debtors to change professionals, or to have different professionals, often fails to create the independent perspective which is intended by such requests.

■ All of that applies here. Requiring Brennan and First Jersey to employ new professionals isn't going to change who the professionals answer to, and whose interests are going to be represented. It will only slow down the cases and add substantial expense. Therefore, unless Mortenson truly has a conflict between *all* of Brennan's collective interests and some other interest of Mortenson's, disqualification of Mortenson is not appropriate.

## 11. *Conclusion*

For the foregoing reasons, the court finds that the governmental agencies have not shown that Mortenson has any conflict of interest which requires its disqualification. The debtors' interests and the prosecution of the bankruptcy cases and the other litigation will be served by permitting the debtors to employ Mortenson, who has represented Brennan for many years. The objections to employment of Mortenson are therefore overruled and the applications are granted.

## II. *The Application to Employ Robinson, St. John & Wayne*

The court's conclusions of law set forth above as to Mortenson regarding the duty of disclosure, presumptions, burdens of proof and conflicts of interest apply generally to First Jersey's application to employ Robinson as well. However, there is one significant fact involving Robinson which differs from Mortenson's situation: the transfer by First Jersey to Robinson on the eve of the bankruptcy petition of the ITB securities in payment of Robinson's retainer for services rendered in the First Jersey bankruptcy case, *and* in payment of Robinson's prepetition claim against First Jersey.

■ The SEC argued that the portion of the transfer for a bankruptcy retainer could be a fraudulent transfer. However, the SEC offered no evidence to support this argument, and the court considers it entirely without merit. It will be summarily rejected.

The difficult issues relate to the portion of the transfer which was in payment of Robinson's prepetition claim. The U.S. trustee and the SEC argue that the payment on Robinson's prepetition claim appears to be a voidable preference under Code section 547(b), and that receipt of a voidable preference is cause for disqualification under Code section 327(a). Robinson denies that the payment is voidable for any reason.

The U.S. trustee and SEC also argue that Robinson is disqualified because it is a creditor. The court will address this argument first.

### 1. *Robinson Is Not a Creditor of First Jersey*

■ The U.S. trustee argues that Robinson is a creditor of First Jersey, and is therefore disqualified from representing First Jersey under Code section 327(a). As previously noted, one must be a disinterested person to be employed under Code section 327(a), and one who is a creditor is not a disinterested person. Code section 101(14)(A). The U.S. Trustee relies primarily on *U.S. Trustee v. Price Waterhouse*, 19 F.3d 138 (3d Cir.1994). In *Price Waterhouse*, the accountant had a prepetition claim for services rendered. Its affidavit in support of the application for employment stated that Price Waterhouse "would not participate as an unsecured creditor in the debtors' Chapter 11 cases and would not vote its claim in connection with the confirmation of any plan of reorganization." *Id.* at 139–140. Price Waterhouse did not waive its claim, however, and the Court of Appeals determined that Price Waterhouse was still a creditor and was therefore not a disinterested person. *Id.* at 142.

The facts of the First Jersey case are, however, materially different from those of *Price Waterhouse*. In this case, Robinson received a transfer of securities in partial payment of its prepetition claim, and waived the balance of such claim. Code section 101(10) defines "creditor" as an entity that *has* a prepetition claim against the debtor, not as one who *had* such a claim. Robinson's waiver is an absolute and final relinquishment of any rights in connection with its former claim. Robinson was therefore no longer a creditor when First Jersey's bankruptcy case was filed, and *Price Waterhouse* is distinguishable.

The court notes further that such waivers are very common in bankruptcy cases in this district. They serve the salutary purpose of enabling debtors to employ the same professionals who they have been using prepetition, with their accumulated knowledge of the debtor's affairs, while at the same time satisfying one of the conditions for such employment.

### 2. *Payment on The Prepetition Claim As a Preference*

■ The U.S. trustee and SEC argue that the payment of Robinson's prepetition claim was a preference under Code section 547(b), and that Robinson therefore holds an interest adverse to the estate under Code section 327(a). Section 547(b) states:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Application of the elements of section 547(b) to these facts is as follows:

(i) The first element is that the transfer must have been of an interest of the debtor in property. It is admitted that the ITB securities were property of First Jersey.

(ii) The second element is that the transfer must have been to or for the benefit of a creditor. Robinson was a creditor of the debtor at the time. *See* Code sections 101(10)(A) and 101(5)(A).

(iii) The third element is that the transfer must have been for or on account of an antecedent debt owed by the debtor before such transfer was made. The court opined at the hearing on August 24, 1995 that pay-

ment of a debt must be past due for this element to be proven. Robinson certified that the transfer of the ITB securities "was made in the ordinary course of business dealings between the parties, and would be deemed timely payment." Second supp. cert. of Walter J. Greenhalgh filed August 21, 1995, ¶ 5. The U.S. Trustee and the SEC alleged no facts and made no arguments to the contrary. The court therefore held that the objecting parties had not made a prima facie showing that Code section 547(b)(2) would probably be proven.

■■■ A debt is generally held to be "antecedent" for purposes of Code section 547(b)(2) if it was incurred prior to the relevant transfer. *See e.g., In re Artha Mgmt, Inc.,* 174 B.R. 671, 678 (Bankr.S.D.N.Y.1994). The case law on section 547(b)(2) focuses primarily on whether the debt was "antecedent." *See In re Lease–A–Fleet, Inc.,* 141 B.R. 853, 862–63 (Bankr.E.D.Pa.1992); *In re Intercontinental Publications, Inc.,* 131 B.R. 544, 549 (Bankr.D.Conn.1991); *In re Fonda Group, Inc.,* 108 B.R. 956, 959 (Bankr.D.N.J. 1989). To satisfy section 547(b)(2), however, a debt must be *both* "antecedent" *and* "owed by the debtor before such transfer was made." *Id.* Under general principles of statutory construction, courts are to attempt to give meaning to all statutory language and to avoid determinations which render any statutory language a nullity. *Astoria Federal Savings & Loan Assoc. v. Solimino,* 501 U.S. 104, 112, 111 S.Ct. 2166, 2171–72, 115 L.Ed.2d 96 (1991); *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 519–20, 99 L.Ed. 615 (1955); *In re Loretto Winery Ltd.,* 898 F.2d 715, 722 (9th Cir. 1990); *In re Vause,* 886 F.2d 794, 801 (6th Cir.1989). Therefore, if possible the courts should construe the clause "owed by the debtor before such transfer was made" in section 547(b)(2) as adding some meaning to the prior words "antecedent debt." That is, the courts should avoid construing 547(b)(2) as containing a redundancy. While research for this memorandum opinion did not disclose any case law expressly addressing this issue, the court concludes for the purposes of this opinion that a debt is not "owed" within the meaning of section 547(b)(2) until payment is past due, even if the debt is admittedly ante-

cedent. This would be a particularly appropriate construction where, as here, the debtor presumably did not know the amount due for legal services and expenses until it received an invoice.

This holding is without prejudice, however, to the right of any party challenging the transfer to argue for a different conclusion of law in an adversary proceeding under Code section 547. None of the parties argued or briefed this issue in connection with these objections.

(iv) The fourth element is that the transfer must have been made while the debtor is insolvent. Under Code section 547(f) a debtor is presumed to have been insolvent during the 90 days immediately preceding the petition.

(v) The fifth element is that the transfer is on or within 90 days before the date of the filing of the petition. Robinson admits that the transfer was within 90 days before the petition date.

(vi) The sixth element is that the transfer must enable the creditor to receive more than it would receive if the case were a liquidation under Chapter 7 and the transfer had not been made. Since it appears from the schedules that unsecured creditors would probably not receive a dividend from First Jersey's scheduled assets in a liquidation under Chapter 7, the objecting parties have shown prima facie that this element would probably be satisfied.

In summary, the objecting parties have made a prima facie showing that all of the elements of Code section 547(b) would probably be satisfied, except for 547(b)(2). Since the elements of section 547(b) are in the conjunctive, the objecting parties have failed to convince the court that the transfer is probably a preference within the meaning of Code section 547.

■■■ In addition, Robinson argues that even if all of the elements of 547(b) were satisfied, the transfer would not be avoidable because it meets the criteria for payments in the ordinary course of business under Code section 547(c)(2). That subsection states:

(c) The trustee may not avoid under this section a transfer—* * *

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms[.]

Code section 547(g) provides that creditors have the burden of proving the nonavoidability of a transfer under section 547(c). Robinson offered evidence that the transfer of the ITB securities meets the elements of 547(c)(2). Second supp. cert. of Walter J. Greenhalgh filed August 21, 1995, ¶ 5; transcript of 8/24/95 hearing, pp. 30–32. The U.S. Trustee replied that it is "unclear" whether the transfer of the ITB securities to pay Robinson was in the ordinary course of business for purposes of section 547(c)(2). Response by U.S. Trustee to second supp. cert. of Walter J. Greenhalgh, filed August 23, 1995, at 4. However, neither the U.S. Trustee nor the SEC offered any evidence to rebut Greenhalgh's description of the manner in which First Jersey paid invoices from Robinson. The court therefore finds that Robinson made a prima facie showing that it will probably prove the elements of section 547(c)(2).

■ The U.S. Trustee and the SEC therefore failed to establish that the payment in question is probably an avoidable preference. The mere accusation that it could be avoidable is not sufficient to disqualify Robinson. As previously noted, a party is presumed to have the right to employ counsel of its choice. *Panduit Corp. v. All States Plastic Mfg. Co., Inc.*, 744 F.2d 1564, 1576–77 (Fed.Cir.1984) ("[t]he right of a party to select counsel of his choice [is] a matter of significant importance, which will not be disturbed unless a specifically identifiable impropriety has occurred."); *In re Mandell*, 69 F.2d 830 (2d Cir.1934) ("[o]nly in rarest cases should the Trustee be deprived of the privilege of selecting his own counsel...."). *See*

*also In re Peck*, 112 B.R. 485, 489 (Bankr. D.Conn.1990) (noting that in matters concerning disqualification, courts "give deference to the right of a client to choose his own counsel so long as high professional standards are maintained."); *In re Heck's, Inc.*, 83 B.R. 410, 417 (1988) (finding that it is a cardinal principle that a trustee be entitled to employ attorneys of his choice, subject only to the approval of the court). This presumption has added weight where, as here, disqualification would undoubtedly result in significant extra expense to the estate and delay to the case in employing replacement counsel.

■ The U.S. Trustee and SEC are correct, however, that Robinson is obviously disqualified from taking any position on behalf of the First Jersey estate as to whether an adversary proceeding should be instituted against Robinson under Code section 547. Moreover, as the court noted at the hearing, Robinson has assumed a risk in taking the position which it has regarding the preference question. If an adversary proceeding is filed against Robinson and the transfer is avoided as to the payment of the prepetition debt, Robinson is subject not only to disgorgement of the preference, but also to the possible denial or reduction of compensation under Code section 328(c) as well.

### 3. *Employment of Robinson as Special Counsel to First Jersey*

■ First Jersey requested in the alternative that if Robinson cannot be employed as general bankruptcy counsel under Code section 327(a), the debtor then wishes to employ Robinson as special counsel under Code section 327(e). The U.S. Trustee and the SEC objected to that as well. The application to employ Robinson under Code section 327(e) is moot because the court has authorized First Jersey to employ Robinson under Code section 327(a). However, Robinson would be qualified to represent First Jersey under section 327(e).

Code section 327(e) provides:

(e) [t]he trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in

conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold an interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

Three conditions must be met to be employed as special counsel. First, the appointment of special counsel must be in the best interests of the estate. *In re DeVlieg, Inc.*, 174 B.R. 497, 502 (N.D.Ill.1994). Second, special counsel must not hold an interest adverse to the estate with respect to the matter for which he or she is employed. *Id.* at 503 (citing *In re Hempstead*, 34 B.R. 624, 626 (Bankr.S.D.N.Y.1983)). Third, the special purpose for which counsel is appointed must not rise to the level of conducting the bankruptcy case for the debtor. *Id.* at 504 (citing *In re Tidewater Memorial Hosp.*, 110 B.R. 221, 227–28 (Bankr.E.D.Va.1989)).

In this case, the first condition of appointment of special counsel is easily met. Robinson possesses a high degree of familiarity with the legal bases and with the evidentiary materials in the various complex lawsuits. Any substitute counsel would be required to duplicate a great deal of Robinson's efforts at this point, at a substantial expense to the estate. In fact, complex cases such as those First Jersey is involved in are precisely the special purposes which motivated Congress to enact section 327(e). *See* H.R.REP. No. 595, 95th Cong., 1st Sess., at 328 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6284–85 (noting that section 327(e) "will most likely be used when the debtor is involved in complex litigation, [and] changing attorneys in the middle of the case after the bankruptcy case has commenced would be detrimental to the progress of that other litigation."). *See also* 2 COLLIER ON BANKRUPTCY ¶ 327.03[6] (15th Ed.1995). Accordingly, the appointment of Robinson as special counsel would be in the best interests of the debtor.

The second condition under section 327(e) requires that the attorney not have an interest adverse to the estate *with respect to the matter on which such attorney is to be employed.* The potential claim by First Jersey's estate against Robinson under Code section 547 would not create any adverse interest between the estate and Robinson in connection with Robinson's representation of the debtor in the lawsuits regarding violations of securities laws. *See e.g., In re G & H Steel Service, Inc.*, 76 B.R. 508 (Bankr. E.D.Pa.1987) (a debtor may retain as special counsel an attorney who has potential claims against the debtor which are unrelated to the litigation in which the attorney is to be employed). No authority was cited or found that specifically precludes an attorney from serving as special counsel under section 327(e) because the attorney may be subject to a preference claim. Thus, Robinson does not have an interest adverse to the First Jersey estate with respect to the matters on which it would be employed.

The final requirement under section 327(e) could also be met quite easily. As special counsel, Robinson's services would be limited to the various lawsuits presently pending against and on behalf of First Jersey. Other counsel could be employed as First Jersey's general counsel in the bankruptcy proceeding. For these reasons, Robinson could have been employed under Code section 327(e) rather than under section 327(a) if it had been necessary to do so.

### 4. *Conclusion*

For the foregoing reasons, the court finds that the governmental agencies have not shown that Robinson has any conflict of interest which precludes it from serving as First Jersey's general bankruptcy counsel under Code section 327(a), as well as continuing as First Jersey's counsel in the lawsuits which were in progress when the bankruptcy petitions were filed. The objections to First Jersey's employment of Robinson are therefore overruled and the application is granted.

Orders accompany this opinion.